THE STATE OF NEW JERSEY, PROSECUTOR, v. CHARLES BIENSTOCK, THOMAS BRODELL AND PETER J. McDONALD. (INDICTMENT No. 139.)

THE STATE OF NEW JERSEY, PROSECUTOR, v. CHARLES BIENSTOCK, THOMAS BRODELL, PETER J. McDONALD AND JOHN F. KELLY. (INDICTMENT No. 169.)

Argued November 9, 1908—Decided June 22, 1909.

1. A combination to accomplish an object which is not criminal by means which are not criminal may become an indictable conspiracy where the public is injuriously involved, or where the result would be either injury or oppression to individuals.

2. An indictment for conspiracy alleged substantially that since the year 1856 continuously the principal political parties in the United States have been and still are known as the Republican party and the Democratic party; that since said date every president of the United States elected by the electors has, before election, been nominated for said office by one of said two parties; that the Republican party has during all that time maintained a central and national political organization known as the Republican national committee, which exercises general and supreme control of the management of said party throughout the United States and has maintained continuously in New Jersey and in each of the states a state political organization known as the Republican state committee, which exercises supreme control of the management of the Republican party in the state of which it is the state committee, and also continuously maintains in each county of New Jersey and in each county of each of the several other states, a county political organization designated as the Republican county committee, which exercises, subject to the state and national committee, supreme control of the management of said Republican party in the county of which it is the Republican county committee; that for many years it has been the right and practice of the Republican national committee, under its rules, in every year in which presidential electors are to be chosen and before they are elected, to issue a call for the holding of a national convention, composed of delegates-at-large and of delegates other than delegates-at-large to be chosen directly or indirectly by the Republican voters of the respective states; that the delegates from the State of New Jersey to the national convention were required by the rules of the Republican state committee of New Jersey to be elected by a convention of delegates chosen by the Republican voters of the counties and the delegates

other than those known as delegates-at-large from New Jersey to the Republican national convention are required by said rules of the state committee to be elected by a convention of delegates chosen by Republican voters in each of the congressional districts of the state, and that delegates to the Republican state convention and to the convention in each of the congressional districts have been during said time required by the rules of the party and of the county committee to be elected by the Republican voters in each of said counties at primary elections held at such times and places in each of the counties as the Republican county committee of each of the counties has designated or may designate; that the county committee in pursuance of the several calls aforementioned, ordered and directed primary elections of the Republican party to be held at a certain time and place throughout the county of Hudson, and appointed the persons who should act at each of said primary elections as election officers to conduct the same; that one such primary was directed and ordered to be held at No. 5 Brunswick street, in the city of Jersey City, for the purpose of receiving the votes of the Republican voters of that ward qualified to vote and offering to vote thereat for delegates to the Republican state convention as aforesaid, and for delegates to the Republican conventions to be held in said congressional district; that the defendants at the time and place aforesaid, designated and appointed by the county committee to conduct said primary at the place aforesaid and for the purpose aforesaid, it became and was their duty as persons actually in charge of and conducting the primary election, to receive the votes of the qualified voters, to give all votes cast their full, due and honest effect, to reject the votes of persons not qualified and to honestly and accurately tally counts, and canvass and declare the full and correct number of votes cast and not to count and declare any votes for any person that were not cast for such person or persons, and to conduct the election fairly and honestly; but that the defendants, unlawfully, willfully, dishonestly, violating their duty to the public in the premises and intending and contriving to cause to be returned to the county committee and accepted by it and by the people of New Jersey as a fact that the persons who were lawfully elected as delegates were not elected as such delegates thereat, and that persons who were not elected for delegates were elected as such delegates, and to defeat, frustrate and nullify the will of a majority of the qualified Republican voters, and to corrupt and pervert the action of the state convention in the election of delegates to the national committee and the action of the congressional district in the election of delegates, and to defraud, cheat and deprive the majority of the qualified Republican voters, did wickedly, &c., combine, &c., to deprive, cheat and defraud, &c., and to pervert, &c., the action of the state convention in the election of delegates to the national convention and the action of the congressional convention in the election of delegates to the national convention; and that in pursuance of the conspiracy did

unlawfully, &c., count three hundred ballots, none of which were cast by any person at the election as ballots cast and voted for persons and candidates at said election, who were not the persons and candidates for whom a majority of all the qualified Republican voters voting at said primary voted—*held*, that the indictment charged a conspiracy, the object of which was unlawful (unlawful acts in this connection not being confined to those punishable as crimes) in that it had a necessary tendency to prejudice the public, and so was essentially a public injury and that such unlawful object was designed to be accomplished by deceit and fraud and was a cheat reaching large numbers of persons and tended to their oppression, and was sustainable as an indictment for a criminal conspiracy.

3. The cases of *State* v. *Woodruff*, 39 *Vroom* 89, and *State* v. *Nugent*, 48 *Id.* 157, distinguished.

On *certiorari*. On demurrer to indictments.

Indictment No. 139 is in the following words:

"The grand inquest of the State of New Jersey in and for the body of the county of Hudson, upon their respective oath, present, that since the year eighteen hundred and fifty six continuously up to the date of the presentation of this indictment, the principal two political parties in the United States of America have been and still are commonly known and designated as the Republican party and the Democratic party; that, since said first mentioned date continuously up to the date of the presentation of this indictment, every president of the United States who has been elected to the presidential office by electors, as prescribed by the constitution of the United States, has, before his said election, been nominated to and for said office, by one or the other of said two political parties, and that, during all the time aforesaid, one or the other of said political parties has been in control of the executive and legislative departments of the government of the United States; that the Republican party has during all the time aforesaid continuously maintained, and still maintains a central and national political organization, commonly known and designated as the Republican national committee, which during all the time aforesaid, possessed and exercised, and still possesses and exercises, general and

supreme supervision and control of the management, conduct
and affairs of said Republican party throughout the United
States aforesaid; and has also, during all the time aforesaid,
continuously maintained and still maintains in the State of
New Jersey, and in each of the several other states of the
United States of America aforesaid, a state political organi-
zation, commonly known and designated as the Republican
state committee, which, during all the time aforesaid, pos-
sessed and exercised and still possesses and exercises, subject
to the said Republican national committee, general and su-
preme supervision and control of the management, conduct
and affairs of the said Republican party in the state of
which it is the Republican state committee, and has also dur-
ing all the time aforesaid, continuously maintained and still
maintains in each county of the State of New Jersey, and in
each county of each of the several other states of the United
States of America aforesaid, a county political organization,
commonly known and designated as the Republican county
committee, which, during all the time aforesaid, possessed
and exercised and still possesses and exercises subject to the
said Republican state committee and said Republican na-
tional committee, general and supreme supervision and control
of the management, conduct and affairs of said Republican
party in the county of which it is the Republican county com-
mittee; that for many years last past it has continuously been,
and still is, the right, duty and practice of the said Republican
national committee, under its rules and regulations, in every
year in which presidential electors are to be elected, and be-
fore they are elected, to issue a call for, and to fix the time
and place for the holding of a national convention of the
Republican party, to be composed of delegates at large and of
delegates other than delegates at large to be chosen directly
or indirectly by the Republican voters of the respective states;
that during all the time aforesaid, the delegates, known and
designated as delegates at large, from the State of New Jersey
to said Republican national convention, representing the Re-
publican voters in New Jersey in said Republican national
convention, have been and still are required by the rules,

regulations and practice of the Republican state committee
of New Jersey, to be elected by a convention of delegates
chosen by the Republican voters of the respective counties of
the State of New Jersey, and the delegates other than those
known and designated as delegates at large, from New Jersey
to said Republican national convention, have been and still
are required by said rules, regulations and practice of said
Republican state committee, to be elected by a convention of
delegates chosen by the Republican voters in each of the sev-
eral congressional districts of the State of New Jersey, and
that said delegates to said Republican state convention in the
State of New Jersey, and to the convention in each of the
several congressional districts of the State of New Jersey,
have been during all the time last aforesaid, and still are re-
quired by the rules, regulations and practice of the Republican
party, and of the Republican county committees of the re-
spective counties of New Jersey, to be elected by the Republi-
can voters in each of the said counties, at primary elections,
held at such times and places, in each of said counties, as the
Republican county committee of each of said counties has
designated or may designate. And the grand inquest afore-
said, upon their oath aforesaid, do further present that the
Republican national committee aforesaid on the
day of            in the year of our Lord nineteen
hundred and eight, issued its call for the holding of a Re-
publican national convention to be held in the city of ·Chi-
cago, in the State of Illinois, on the sixteenth day of June
in the year last aforesaid, for the purpose of nominating the
candidates of the Republican party for each of the respec-
tive offices of president of the United States and vice presi-
dent of the United States; that in obedience to and in com-
pliance with said call the Republican state committee of the
State of New Jersey issued its call, addressed to said several
Republican county committees of the State of New Jersey
for a state convention, to be held in the city of Trenton, in
this state, on the fifth day of May, in the year last aforesaid,
for the purpose of electing four delegates at large to the Re-
publican national convention aforesaid, and also for the hold-

ing of a convention in each of the several congressional districts of the State of New Jersey, for the purpose of electing delegates, other than delegates at large, to said Republican national convention; and that in obedience to and in compliance with said call so as aforesaid issued by said Republican state committee, the Republican county committee of the county of Hudson, of this state, on the                day of                in the year last aforesaid, ordered and directed that primary elections of the Republican party should be held on the twenty-eighth day of April, in the year last aforesaid, throughout the said county of Hudson, and appointed the persons who should act at each of the said primary elections, and that one of the said primary elections so ordered and directed by the said Republican county committee was by the said committee ordered and directed to be held, and was held at Number 5 Brunswick street, in the city of Jersey City, for the                districts of the Fifth ward of the said city of Jersey City (said districts of said ward being then and there included in and forming a part of the Tenth congressional district of the said State of New Jersey) for the purpose of receiving the votes of the Republican voters in the                districts of the said Fifth ward, of the city of Jersey City, qualified to vote and offering to vote at said primary election, for delegates to the Republican state convention as aforesaid, and for delegates to the Republican conventions to be held in the Tenth congressional district of the State of New Jersey.

"And the grand inquest aforesaid, upon their oath aforesaid, do further present, that Charles Bienstock, Thomas Brodell and Peter J. McDonald, all late of the city of Jersey City, in the county of Hudson aforesaid, on the twenty-eighth day of April, in the year of our Lord one thousand nine hundred and eight, at the city of Jersey City, in the county aforesaid, and within the jurisdiction of this court, being then and there designated and appointed by the said Republican county committee aforesaid, to conduct, and then and there conducting, a Republican primary election at Number 5 Brunswick street, in the city of Jersey City, for the Fifth ward in said

city, for the purpose of receiving the votes of all Republican voters qualified and offering to vote at said primary election and residing in the Fifth ward of the city of Jersey City for four delegates to the Republican state convention so called to meet at Trenton as aforesaid, and for four delegates to the congressional districts of New Jersey as aforesaid, it became and was their duty as the persons actually in charge of and conducting said primary election, to receive at said primary election the votes of all qualified Republican voters in said districts of said ward, who desired and offered to vote at said primary election for any person or persons as delegate or as delegates to said Republican state convention or to said congressional conventions, and to give to all votes cast at said primary election their full, due and honest effect, and to reject the votes of all persons offering to vote at said primary who were not qualified Republican voters in said district's ward; and to honestly and accurately tally, count, canvass, allow and declare the full and correct number of votes cast at said primary election by qualified Republican voters voting thereat, for the person or persons for whom said votes were cast; and not to tally, count, canvass, allow and declare any votes for any person or persons at said primary election that were not cast for such person or persons; and to conduct said election in all respects fairly and honestly, to the end that the persons and candidates receiving a majority of the votes cast at said election by qualified Republican voters voting thereat, should be declared to be, and should be, returned to the said Republican county committee, and should be permitted to act as delegates elected at said primary election, and that thereby full, due and honest effect should be given to the wishes and votes of the qualified Republican voters voting at said election, as to the delegates who should represent them in the said state convention, and in the said congressional district conventions; but that they, the said Charles Bienstock, Thomas Brodell and Peter McDonald, willfully, unlawfully, dishonestly, immorally, fraudulently and corruptly disregarding and violating their duty to their party and to the public in the premises, and designing, contriving and intending to

make it publicly appear, and to cause to be returned to said Republican county committee, and to be accepted by said committee and by the people of New Jersey as a fact that the persons who were lawfully elected at said primary election as delegates to said respective conventions, were not elected as such delegates thereat, and that persons who were not elected at said primary election as delegates to said respective conventions were elected as such delegates thereat; and to defeat, frustrate, nullify and set at naught the will, wishes, purposes and intentions of a majority of the qualified Republican voters voting at said primary election as to the persons whom they desired, and for whom they had voted at said primary election, to represent them as delegates in said Republican convention; and to corrupt and pervert, so far as in them lay, the action of the state convention in the election of delegates at large to said Republican national convention, and the action of the congressional district convention in the election of delegates, other than delegates at large, to the Republican national convention; and to deprive, cheat and defraud the majority of the qualified Republican voters voting at said primary of their lawful right to have their votes tallied, counted, allowed and declared as cast for the persons and candidates for whom their said votes were in fact cast at said election, and of their lawful right to have full, due and honest effect given to their said votes, and to their lawful right to have no votes tallied, counted, allowed or declared that were not cast at said election by qualified Republican voters entitled to vote thereat, did wickedly, dishonestly, immorally, fraudulently, corruptly, falsely, knowingly and unlawfully combine, unite, confederate, conspire and bind themselves by agreement to deprive, cheat and defraud the majority of the qualified Republican voters voting at said primary election of their lawful right to have their votes tallied, counted, canvassed, allowed and declared as cast for the persons and candidates for whom their said votes were in fact cast at said election, and of their lawful right to have full, due and honest effect given to their said votes, and of their lawful right to have no votes tallied, counted, allowed or declared as cast for

any person or candidate at said election that were not in fact for such person or candidate at said election by qualified Republican voters entitled to vote thereat; and to deprive, cheat and defraud the persons who were elected delegates at said election of the right to act as delegates; and to declare and make it publicly appear, and to cause it to be returned to said Republican county committee and to be accepted by said committee and by the people of New Jersey as a fact that the persons who were lawfully elected at said primary election as delegates to said respective conventions were not elected as such delegates thereat, and that persons who were not elected at said primary election as delegates to said respective conventions were elected as such delegates thereat; and to defeat, frustrate, nullify and set at naught the will, wishes, purposes and intentions of a majority of the qualified Republican voters voting at said primary election as to the persons whom they desired and for whom they had voted at said primary election to represent them as delegates in said Republican conventions; and to corrupt and pervert, so far as in them lay, the action of the state convention in the election of delegates at large to said Republican national convention, and the action of the said congressional district convention in the election of delegates, other than delegates at large, to the Republican national convention.

"And the grand inquest aforesaid, upon their oath aforesaid, do further present that the said Charles Bienstock, Thomas Brodell and Peter J. McDonald, so being in charge of and conducting said primary election as aforesaid, together with divers other evil-disposed persons, whose names are to the grand inquest unknown in execution of the said last-mentioned premises, and in pursuance of the said conspiracy, combination, confederation and agreement, between and amongst them as aforesaid, and to effect the object thereof, afterwards, to wit, on the twenty-eighth day of April, in the year aforesaid, at the city of Jersey City aforesaid, in the county of Hudson aforesaid, did willfully, corruptly and unlawfully estimate, number, count, canvass, tally and give effect to a large numbers of ballots, to wit, three hundred ballots, none of which

were then and there cast and voted by any person at said election, as ballots cast and voted for persons and candidates at said primary election who were not the persons and candidates for whom a majority of all the qualified Republican voters voting at said primary election voted and cast their ballots, to the great prejudice, injury," &c.

Before Justices GARRISON, PARKER and VOORHEES.

For the state, *Pierre P. Garven,* prosecutor of the pleas. *Joseph M. Noonan,* of counsel.

For the defendants, *Alexander Simpson.*

The opinion of the court was delivered by

VOORHEES, J. Two indictments for conspiracy were returned against the defendants by the grand jury. To each a general demurrer was filed and thereafter writs of *certiorari* removed them into this court for the determination of the questions arising upon the demurrers.

The first indictment, known as No. 139, consisting of a single count, has been above set forth *in extenso.* The other indictment, No. 169, consists of four counts, the first of which is the same as No. 139, being founded on precisely the same facts. The second count concededly cannot be sustained. The third count is substantially covered by the first count. The fourth count seems to be bad under *State* v. *Nugent,* 48 *Vroom* 157.

The controversy is mainly concerned with the first count of each of the indictments and not with the supplementary counts in the second indictment, so that the real question presented is whether the first counts above mentioned allege a criminal conspiracy.

At the outset it must be conceded that the nomination of a president and vice president of the United States is not recognized by the constitutions or laws, either federal or state. The mode of choosing these officers is found in the United

States constitution. Article II., section 1, provides that the president and vice president "shall be elected as follows: Each state shall appoint in such manner as the legislature thereof may direct a number of electors," and article XII. (twelfth amendment) provides that the electors "shall name in their ballots the person voted for as president and in distinct ballots the person voted for as vice president," and sign and certify the voting lists and transmit them to the seat of government.

It is perceived that the electors of each state are free to vote for any person for these offices who is not disqualified.

The choice of electors is, however, wholly within state jurisdiction, and the state has power to punish for illegal and fraudulent voting for presidential electors. *In re Green,* 134 *U. S.* 377. These indictments, however, have not for their object the punishment of such fraudulent voting. Nor are they concerned with a violation of the State Primary Election act, for that act is not comprehensive enough to include the primary election referred to in the indictments. The wrong specified as the object of the conspiracy is the tampering with ballots cast at a party primary voluntarily held for the choice by the Republican voters of the ward (*a*) for delegates to the Republican state convention at Trenton, which was to elect four delegates-at-large to the Republican national convention to be held at Chicago, and (*b*) for delegates to the Republican convention of the tenth congressional district of New Jersey, which was to elect district delegates to the Republican national convention. The national convention in turn recommends persons for president and vice president of the United States to be voted for by the electors who may constitutionally vote as they choose notwithstanding such recommendation.

It is conceded that the acts charged as the purpose of the conspiracy do not constitute a crime for which an indictment would lie.

Do the facts present a situation where neither the object of the conspiracy nor the means need be criminal in order to sustain an indictment for conspiracy?

In 1899 (*Pamph. L., p.* 214) the Crimes act relating to conspiracies was amended so that instead of providing "any two or more persons who shall combine, &c., to commit any *offence*" the word *"crime"* was substituted for the word *"offence."* The old act containing the word "offence" was construed in *State* v. *Norton,* 3 *Zab.* 33, and it was there stated "when the common law and the statute differ, the common law gives place to the statute, but only when the latter is couched in negative terms, or where its matter is so clearly repugnant that it necessarily implies a negative, and the common-law offence of conspiracy was not abolished by the statute defining conspiracy, but such a conspiracy as was indictable before the statute at common law is so still." This case, therefore, is not necessarily governed by the statute. We must look to the common law.

The earlier decisions in New Jersey held that a conspiracy to be the foundation of an indictment must be directed to the perpetration of a crime, or, when having for its object a lawful or indifferent act, it must be accomplished by criminal means.

*State* v. *Rickey,* 4 *Halst.* 293, was an indictment for conspiracy to obtain money from a bank by means of checks and drafts of the defendants to be drawn on the cashier when the defendants had no funds in the bank for their payment, and the court held that an indictment would not lie for a conspiracy to commit a civil injury of any description that is not in itself an indictable offence.

Chief Justice Green, however, in *State* v. *Norton, supra,* speaking of State *v.* Rickey, says: "In this state the point (whether a conspiracy to commit a private injury, which is not in itself a public offence, can constitute the offence of conspiracy at the common law) has never been decided. In the case of State *v.* Rickey, Justice Ford, in delivering his opinion, does indeed say that it may be laid down as a settled rule that an indictment will not lie for a conspiracy to commit a civil injury of any description that is not in itself a public offence, but that was not the opinion of the court," and then proceeds to say "the great weight of authority, the adjudged cases, no less than the most approved elementary writers sus-

tain the position that a conspiracy to defraud individuals or a corporation of their property may in itself constitute an indictable offence if the act done or proposed to be done in pursuance of the conspiracy be not in itself indictable," citing numerous authorities.   He continues:

"A combination (says Justice Gibson) is a conspiracy in law whenever the act to be done has a necessary tendency to prejudice the public or oppress individuals by unjustly subjecting them to the power of the confederates and giving effect to the latter, whether of extortion or mischief," and then further on in the opinion adverts to the fact that to defraud a bank rests upon somewhat different grounds from a conspiracy to oppress an individual, saying:

"It appears upon principle to come within this class of acts which are held to be indictable on the ground that the act done though not in itself indictable is essentially a public injury."

This case would therefore seem to overthrow the doctrine supposed to have been enunciated in State *v.* Rickey, or at least to render that case inept upon the point for which it has been quoted.

The soundness of the decision in *State v. Norton, supra,* was not denied in the case of *State* v. *Young,* 8 *Vroom* 184, if indeed it may not be considered to have been approved by it.

In *State* v. *Donaldson,* 3 *Vroom* 151, Chief Justice Beasley refers to the preceding cases and says:

"It is certain, however, that there are a number of cases in which neither the purposes intended to be accomplished nor the means designed to be used were criminal which have been regarded to be indictable conspiracies," and then referring to *State* v. *Rickey, supra,* and *State* v. *Norton, supra,* remarks on the latter case:

"The rule of law thus enunciated appears to me to be the correct one.   There are a number of cases which cannot be sustained upon any other doctrine," and, after citing cases, continues:

"These are all cases, it will be noticed, in which the act which formed the foundation of the indictment would not,

in law, have constituted a crime, if such act had been done by an individual, the combination being alone the quality of the transactions which made them respectively indictable. I conclude, then, that there is no uncertainty in this legal topic to this extent, in addition to the principles before adverted to, that cases may occur in which the purpose designed to be accomplished becomes punitive, as a public offence, solely from the fact of the existence of a confederacy to effect such purpose. It is certainly not to be denied, however, that great practical difficulty is experienced whenever any attempt is made to lay down any general rules by which to discriminate that class of combinations which becomes thus punishable, from those which are to be regarded in their results as mere civil injuries, remediable by private suit. It may be safely said, nevertheless, that a combination will be an indictable conspiracy whenever the end proposed, or the means to be employed are of an highly criminal character, or where they are such as indicate great malice in the confederates, or where deceit is to be used, the object in view being unlawful, or where the confederacy, having no lawful aim, tends simply to the oppression of individuals. A careful analysis of the cases which have been heretofore adjudged will reveal the presence of one or more of the qualities here enumerated; to this extent, therefore, they may be relied on as safe criteria whereby to test new emergencies as they may be presented for adjudication."

In *State* v. *Cole,* 10 *Vroom* 324, Chief Justice Beasley also delivered the opinion. The gravamen of the charge was the fraud of a partner in fabricating the notes of his firm and with the collusion and aid of a third person putting them to a use entirely alien to the business of the firm. It was there urged that the facts charged in the indictment did not constitute a criminal offence inasmuch as a partner has a right to execute and put off the notes of the firm; that was but a civil injury and not a breach of the public law. The court continuing, says:

"But this is a fallacious view, which has a plausible semblance only, because all the constituents of the problem to be

solved are not taken into account. The query is not whether it is an indictable offence for a member of a firm to direct a partnership note to alien uses, but whether it is not such crime for him to do such act by concert with a third person, the intention of the two being fraudulent, and the act being carried into effect by deceitful devices. It is these added characteristics of the affair which, in my view, heighten the malfeasance into a punishable crime. Keeping in mind these adjuncts, the case easily falls within the scope of the offence of conspiracy, as defined in *State* v. *Donaldson, 3 Vroom* 151."

*State* v. *Hickling, 12 Vroom* 208, was a conspiracy to slander a person by charging him with a criminal offence. The objection was made that taking the pleading at its best it alleged nothing more than a conspiracy to defame a person by the propagation of a slander, and that the wrong thus charged was a civil injury and not a criminal offence. The learned Chief Justice then says:

"But the rule of law thus assumed to exist is not only unsupported so far as has been described by any authority, but is opposed by several direct decisions and is inconsistent with the general legal authority of the subject. The cases on this head heretofore settled by this court, are with respect to the legal principle underlying that, entirely at variance with the rule here contended for," quoting the Donaldson case and the Cole case.

In *State* v. *Rowley, 12 Conn.* 101, the court said:

"Many acts, which if done by an individual are not indictable, are punishable criminally when done in pursuance of a conspiracy among numbers," and the doctrine that a combination to do an unlawful act, is punishable as a conspiracy even though the act attempted was not a crime *per se* or by statute, was held in *Smith* v. *People, 25 Ill.* 17, where the court said:

"If the term unlawful means criminal or an offence against the criminal law and as such punishable, then the objection taken to this indictment is good," the unlawful act in that case being an act not indictable or punishable as a crime; but the court continues:

"But by the common law governing conspiracies, the term is not so limited, and numerous cases are to be found where convictions have been sustained for conspiracies to do unlawful acts, although those acts are not punishable as crimes; nor yet would it be quite safe to say that the term unlawful as here used includes every act which violates the legal rights of another, giving that other a right of action for a civil injury, and we are not prepared to say where the line can be drawn."

Where the conspiracy results in mischief to the public, it seems that the indictment will be sustained where neither the object nor the means are criminal. In speaking of conspiracies involving public mischief, the remarks of Chief Justice Beasley, in *State* v. *Young, supra,* are pertinent. He says:

"There are many acts and things which become punishable on the ground that they affect seriously the rights of many, which are not so when they thus affect the rights of only one or a few. A nuisance is an illustration of this principle. Such a wrong originating in a private trespass, as it expands so as to work a hurt to numbers of persons, is converted into an offence against the community. I see no reason why, by analogy of reasoning, a cheat designed to be practiced against a body corporate representing the public, is not to be put on a similar footing. In a politic point of view an injury grows in aggravation in the ratio of the number of persons injuriously affected by it, and the public is interested in the same ratio in preventing its recurrence. And public cheats not only reach large numbers of persons, but they are easy to effect and most difficult to detect and punish. There are certainly the strongest social grounds to treat and punish them as crimes, and although there may be no case precisely in point, there are those which rest upon principles which logically lead to this result. But the cases go further than to hold that such indictments are sustainable only where the public is injured, an injury resulting to individuals is sufficient to sustain them."

In North Carolina an indictment was sustained (*State* v. *Younger,* 1 *Dev.* 357) for conspiracy to cheat one by making

him drunk and playing falsely at cards with him.   See, also, *Twitchell* v. *Commonwealth*, 9 *Pa. St.* 211.

From this resumé it appears to be true that an indictable conspiracy may be a combination to accomplish an object which is not criminal by means which are not criminal, where the public is injuriously involved or where the result would be either injury or oppression to individuals.  Adopting that as the law, do the facts in this case come within the legal limits of the rule thus laid down?  The casting of votes at a primary of the kind in question clearly was an act not illegal, but rather one having a purpose highly beneficial to the public, designed to bring into public view, and so to the notice of the presidential electors, those men whom the public at large by means of primaries, delegates and conventions, agencies voluntarily accepted by the people, had recommended as being, in their opinion, fit for and capable of exercising the duties of the high office which the electors were under the constitution to fill.  In *Hopper* v. *Stack*, 40 *Vroom* 562, the Supreme Court sustained the constitutionality of the Primary Election law as being admittedly a regulation of established party methods, and as regulative and protective as to the right to vote at primaries, holding that it did not create the right but was based upon the legislative determination of the antecedent existence of that right.  The court in that case said:

"Thus the legislature must have recognized as a fact the existence of political parties of varying numerical strength by which candidates for popular election were placed in nomination upon party tickets and platforms.  It must likewise have determined that in the selection of such nominees each of these political parties invited the co-operation of voters ·who were in practical affiliation with it, and resented attempts at participation by or interference from those not so in sympathy.  The legislature must further have decided that the purpose of these party proceedings were so far *public purposes* that those engaged in them ought to be protected in what they had undertaken, and that to this end the police power of the state should be exercised.  *  *  *  In all of this there is

no calling of anything into existence, no creation of political parties or of primary meetings, no prescription of the terms of membership—in fine no initiation of any essential matter, but only the recognition of an existing state of facts, and a determination to throw over them the protection of police regulation. * * * My conclusion upon this phase of the argument * * * is that primary elections as they in fact exist are so far matters of public concern that they are proper objects of legislative oversight."

Before the passage of the present Primary act the legislature had recognized the right of the individual to hold primaries. See "An act to regulate the holding of and to prevent fraud in primary elections of the several political parties in the cities of New Jersey," approved May 9th, 1884 (*Pamph. L., p. 323*), and therein recognized "the rules and regulations adopted by either party for the government of said primary election."

Another instance of like recognition is afforded by "An act to prevent and punish bribery at primaries, conventions and elections." *Pamph. L.* 1883, *p.* 171. This act has to do with influencing by bribery voters at any election of any delegate to any convention of any political party of this state to nominate any candidate, &c., thus recognizing the right and practice of the people to vote at primaries for delegates to nominating conventions.

Political conventions for the recommendation of presidential candidates are by no means new. They have been in existence certainly as early as the year 1825, although not continuously nor uniformly. But, as the indictments charge, they have been continuously resorted to for over fifty years and for the purpose of recommending candidates for the consideration of the presidential electors. Their purposes, the crystallizing of political sentiment and the manifestation of the will of the people from all parts of the country as to their choice for nominees, are not only lawful but in entire accord with our notion of government by the people, and, moreover, are public purposes. It may not be too much to say that, having been so recognized and so used by the people as a

means of expressing their ideas and wishes, to interfere with such expression by the unlawful means of tampering with the ballots cast at such primaries by deceitful and fraudulent devices, and thereby depriving, cheating and defrauding the majority of those entitled to vote at such primary of their lawful right to have their votes cast thereat honestly counted, is interfering with a public act lawful in its purpose, so recognized by the people and by the legislature, and one in the exercise of which all citizens are entitled to protection from combinations designed to prevent the honest use of these agencies. As was said in *State* v. *Woodruff*, 39 *Vroom* 89, 94, "Fraud is clearly charged in the indictment before us and is of such a kind as should be punished."

We think, therefore, that the object of the conspiracy was unlawful (unlawful acts in this connection not being confined to those punishable as crimes) in that it had a necessary tendency to prejudice the public and so was essentially a public injury, and that this unlawful object was designed to be accomplished by deceit and fraud, was a cheat reaching large numbers of persons and tended to their oppression.

The first indictment, No. 139, must be sustained as well as the first count of indictment No. 169.

These views render unnecessary a consideration of the learned and able argument on the part of the state evincing great research, putting forth the claim that the right of the people of New Jersey to vote is an inherent political right, which had been exercised and recognized from the earliest times in England, citing in support *Ashby* v. *White*, 14 *How. St. Tr.* 795, and tracing the origin of the right from the words of Tacitus, from accounts of the elections of the kings, the nature of the Witenagemote and other historical sources, and from the mode of conducting an election for members of parliament, as described in 8 *Petersd. Abr. Com. L.* 453, 664.

We are met, however, on the part of the defendants, with the argument that the primary described in the indictments is of the same character as that under consideration in *State* v. *Woodruff*, 39 *Vroom* 89, wherein this court used the following language:

"Nor are we able to sustain this indictment as a common-law indictment. It is undoubtedly true that fraud at elections was indictable at common law and is still, irrespective of the statute. In *Commonwealth* v. *McHale,* 97 *Pa. St.* 397; 39 *Am. Rep.* 808, 813, Chief Justice Paxon, of Pennsylvania, discusses this whole question and refers to the rule as to such indictments in this country.

"But the election at which the fraud is committed, to constitute the common-law offence, must be a popular election, the fraud going to the destruction of the right of the elective franchise in the selection of public officers for public positions. Such a thing as a primary was not known at the common law. It is the outgrowth of a modern convenience or necessity. A primary is not an election in the sense of the common law; it is merely a method for the selection of persons to be balloted for at such an election. Prior to our primary acts a primary had no legal *status* whatever. All it has now is statutory, and all the penalties for its violation must be found in the statute."

In considering that case and its authority to control the present case, two things must be noted—*first,* it was not an indictment for conspiracy, but for unlawfully and fraudulently counting the ballots contrary to the statute, and *secondly,* it was expressly founded upon section 217 of "An act to regulate elections," revision of 1898. It was therein declared that the act specified as a crime was not made so by the above statute.

In the present case we are concerned with a conspiracy the object of which is unlawful in the sense hereinbefore pointed out, which renders it unnecessary that we should find express warrant in the law, either common or statutory, to bring its object within the ban of the criminal law.

Hence, what was said regarding the *status* of a primary, and that it was unknown to the common law, must be understood to apply to the case then *sub judice* and not to be extended to the facts in the present case, which are quite distinguishable.

"When an offence is created by statute * * * the in-

dictment must be drawn in reference to the provision of the statute." 1 *Whart. Cr. L.*, § 371. Such was the condition in the Woodruff case. Hence the remarks as to the court's inability to sustain the indictment at common law were *obiter*.

*Commonwealth* v. *McHale,* 39 *Am. Rep.* 808, cited in the Woodruff case, is not an authority at variance with our holding in the present case. In that case the defendant, not an election officer, was indicted on three counts, for (1) fraudulently entering names on the poll books; (2) depositing false and fraudulent ballots in the ballot box, and (3) for making a false and fraudulent count at an election of a district attorney. There was no statute that covered it, but the court sustained the indictment as valid at the common law, saying:

"We are of opinion that all such crimes as especially affect public society are indictable at common law. The test is not whether precedents can be found in the books, but whether they injuriously affect the public policy and economy. An offence against the freedom and purity of elections is a crime against the nation. It strikes at the foundation of republican institutions. Its tendency is to prevent the expression of the will of the people in the choice of rulers, and to weaken the public confidence in elections. The ingenuity of politicians is such that offences against the purity of elections are constantly liable to occur which are not specifically covered by statute. It would be a reproach to the law were it powerless to punish them."

Assuming, however, that the primary was unknown to the common law, that fact cannot be made the basis for an argument that a combination like the one in question is not indictable at common law. Nor is *State* v. *Nugent,* 48 *Vroom* 157, controlling here. There the indictment was for conspiracy, the object of which was to procure unqualified voters to vote, in violation of the statute concerning primary elections. The indictment was confined to the statute and did not attempt to describe a wrongful act apart from the statute, and its statutory description of the wrong having failed, resort to the common law was precluded. Therefore, these cases were not controlling. Rights unknown to the common law, if they

be in truth rights, are protected by the principles of the common law, and then infringement by conspiracy is punishable by the criminal law.

There being but a single count in indictment No. 139, and the demurrer interposed to indictment No. 169, which contains four counts, being a general demurrer to the whole indictment, the demurrer in each case must be overruled, the sustaining of a single count being sufficient to produce that result.

The court, therefore, determines that the said indictments are sufficient in law and that an order may be entered that the same be returned by the clerk of this court to the court from which they were removed to the end that said court shall proceed thereon in the same manner as if the said writs of *certiorari* had not been allowed, with costs to be recovered against the defendants.