ARCHIBALD N. LOUDON, petitioner-appellant,

*v.*

DOROTHY AYRES LOUDON, defendant-respondent.

[Argued May 24th, 1933. Decided October 16th, 1933.]

Mr. *Charles A. Rooney,* for the defendant-respondent.

Mr. *John L. Ridley,* for the petitioner-appellant.

The opinion of the court was delivered by

PERSKIE, J.

This appeal brings up for review the dismissal by the advisory master of the husband's petition for divorce based on adultery, and also the wife's counter-claim for separate maintenance, and which counter-claim was likewise based on adultery. The facts developed are fully set forth in the conclusions of the advisory master.

The primary question involved in the husband's case against the wife is whether we should feel bound, as did the advisory master, by the rule of law invoked by the wife, which prohibits either spouse from testifying against the

other as to non-access, as such rule was stated by Lord Mansfield in the case of *Goodright* v. *Moss* (*1777*), *2 Cowp. 591* (more commonly known as the Lord Mansfield rule).

Authorities are not in accord. In England the house of lords (1924) in the case of *Russell* v. *Russell, 13 British Ruling Cases 246,* again followed the rule. For interesting review of this case, see article by L. A. Whitfield. *5 Australian Law Journal* (*1931*), *114.*

In America many jurisdictions such as Arkansas, California, Maryland, Massachusetts, Michigan, Nebraska, New Hampshire, New Mexico, New York, North Carolina, Oklahoma, Oregon, Pennsylvania, Texas, Wisconsin (*60 A. L. R. 380*), have steadfastly adhered to and followed the rule. In our own state the question has not been decided.

In the case of *Palmer* v. *Palmer, 79 N. J. Eq. 496,* the husband filed a petition to annul the marriage upon the ground that he was under the age of consent when it was contracted. The wife filed a cross-petition setting up the fact of the birth of a child and praying that petitioner might be decreed to support it. To that cross-petition the husband answered that he was not the father of the child and was therefore not obliged to support it. The defendant offered himself as a witness to prove that he was not the father of the child. His evidence on this point was excluded upon the ground that under the circumstances disclosed in the case, it must be conclusively presumed that he was the father of the child and that he could not be allowed to disprove it. Vice-Chancellor Howell held:

"In my judgment, the American rule, as I shall call it, seems to be a more reasonable one. It does not prevent the admission of evidence on the subject from other sources, but it does prevent the parties from stultifying themselves and committing a fraud upon each other and upon their children. I therefore hold that it was not competent for the husband to testify as a witness to prove the illegitimacy of the child in question."

This case analyzed will disclose that the Lord Mansfield rule—of non-access—while discussed, was not directly in-

volved in the case. The exclusion of the husband's testimony was on the direct issue of the legitimacy of the child. It was an annulment proceeding and not on a petition for divorce.

In *Kohlenberg* v. *Kohlenberg, 74 Atl. Rep. 432,* not officially reported, in an oral opinion by the late Vice-Chancellor Leaming, it appears that the facts and circumstances are very similar to the instant case, namely, a full-time child and no access when impregnation must have taken place. The husband's testimony of non-access was fully taken. Divorce was granted.

In *Titus* v. *Titus, 3 N. J. Mis. R. 241,* the direct question was not involved. The decision of Vice-Chancellor Buchanan was based on the failure of proof and the marital offense of desertion on the husband's part.

In the case of *Wallace* v. *Wallace, 73 N. J. Eq. 403,* Mr. Justice Swayze, speaking for the court of errors and appeals, held:

"We think the decree should be affirmed, for the reasons given by the learned vice-chancellor, but in affirming the decree it is not necessary to hold that the testimony of the husband was admissible to prove non-access to his wife. No objection was made to the reception of his testimony, but we desire to leave undecided the questions whether our Evidence act makes the testimony competent as against an objection, and whether public policy permits the objection to the testimony, if valid, to be waived by the adverse party."

In the court of chancery, Vice-Chancellor Bergen took the testimony of both husband and wife, without objection on the question of non-access and decided the case chiefly on the weight of the evidence.

The question is now squarely before us. What should determine the view we should adopt? The answer is obvious. We shall adopt that view in the case at bar which we adopt in all our deliberations, namely, the one that shall lead to a righteous judgment. Such a judgment necessarily must be founded on truth, reason and justice. A rule of law which has existed in our mother country for over one hundred and fifty years and has been adopted and followed in so many

of our sister states would ordinarily strongly recommend itself for our favorable consideration. But the fact that the rule is based on a foundation that is unsound and leads to the suppression of the truth and the defeat of justice takes from it the customary traditional and precedential justification, urging its adoption.

It seems to us that it is a rather serious indictment against the great science of legal jurisprudence, which has for its purpose the administration of justice, to compel one, who, under our judicial branch of government, is vested with the powers and duties of interpreting and administering the law, to say, *in limine,* "I am compelled to decide this case against what seems to be the truth of it." A law which compels such a conclusion is not only impotent and embarrassing, but is a law which despite its tradition and universality, was never justified and should not be followed.

Great progress has been made in every field of human endeavor since 1777. Many and varied have been the changes. So has the law, from time to time, likewise undergone changes. Majestically the law always lends itself to an interpretation which results in the safeguarding and preservation of human and property rights. It is because law is based on reason and justice that it ultimately triumphs. The science of the law must not merely be a pulsating and living factor but a virile, wholesome and ardent champion of truth and justice as well.

Professor Wigmore, in his treatise on evidence (volume 4—2d edition, 1923—section 2063), vigorously assails the Lord Mansfield rule. Very clearly does he point out that:

"In the first place, it was limited strictly to filiation proceedings; it had no *status as a rule of general application, for its reason* had no such bearings. In the next place, the ground of the objection was that of interest, *i. e.,* the wife was testifying to discharge the husband of the child's support; yet the objection did not in strictness apply (since the husband was not a party), and furthermore the exception of necessity (*ante,* par. 612) *would in any event* allow her testimony to intercourse with the other man. Her testimony to non-access, however, being only technically admissible within the rule of disqualification, by interest, some additional corroboration was thought essential in order to found an order; hence the doctrine of

R. v. Reading forbade such an order, in Lord Hardwick's language, where the wife was 'a sole witness.'

"The important feature of this rule is thus the bearing of the wife's disqualification by interest; and, when the question first comes up in the United States, the same objection is the one that occupies judicial attention * * * a principle which, of course, to-day in most of our jurisdictions is outlawed (partly or entirely) by statute (*ante*, chap. 619). That the testimony is to the fact of non-access is therefore of no importance at all in this rule of R. v. Reading, except so far as the necessity-exception to the rule of disqualification by interest might not apply to that fact while it might apply to others. That the fact of non-access, of itself, was a thing not proper to be testified to, either on moral or on sentimental grounds, or that parents could not testify to illegitimacy, never for a moment occurred to these judicial expounders of the common law; and this is seen clearly enough in rulings through the 1700's, in other kinds of litigation, where the objection based on disqualification by interest did not arise as it did for the case of filiation proceedings.

"But, in the meantime, while these rulings were being made, came Lord Mansfield's sonorous utterance, in another part of the juristic field, that 'the law of England,' as well as 'decency, morality, and policy,' forbade a parent's testimony to non-access:

" '1777, *Goodright* v. *Moss, Cowp. 591* (ejectment; issue of the claimant's legitimacy as born after marriage of F. and M.; argued for the claimant that "though the testimony of parents in their lifetime or their declarations after their decease might be admissible in cases where proof of the marriage was presumptive only, as by cohabitation or general reputation, yet neither their declarations nor their personal testimony (of birth before marriage) could be admitted to bastardize their issue, whereas in this case the facts of the marriage was actually proved (by the register-entry"). Mansfield, L. C. J.: "All the cases cited are cases relative to children born in wedlock; and the law of England is clear that the declarations (or testimony on the stand) of a father or mother cannot be admitted to bastardize the issue born after marriage. * * * As to the time of the birth, the father and mother are the most proper witnesses to prove it. But it is a rule founded in decency, morality, and policy, that they shall not be permitted to say after marriage that they had had no connection, and therefore that the offspring is spurious; more especially the mother, who is the offending party." '

"It is possible to imagine more than one explanation of the aberration which prompted this utterance. But what Lord Mansfield said was plain. It might be argued that he spoke '*obiter;*' yet Lord Mansfield's '*obiter dicta*' were as effective as other men's positive decisions; and at any rate it was his opinion. What must be conceded and emphasized, however, is that he had no authority whatever for his utterance. If there is any such law of England, or was for any period, it was invented by him and dates from his utterance. Before long it began to be repeated with approval, and the way was paved for substituting his new law for the existing law.

"But what had become, in the meantime, of R. v. Reading? Was not its authority and that of its successors, as firm and unmistakable as ever? Could Lord Mansfield's single utterance overthrow a long line of clear precedents? It could and did, but first through misconstruing them. Whom the gods wish to destroy, they first make mad; which, for legal precedents, means that they must first be misunderstood. In 1809, in R. v. Kea, within two years after R. v. Luffe (the last lineal successor of R. v. Reading), the settled rule in filiation orders was held to mean that the married mother was incompetent to testify, and not merely that she could testify but must be corroborated. This, of course, was in positive contradiction of those cases, though it purported to follow them. The way was now open. R. v. Kea excluded the married mother's testimony to non-access in filiation cases; Lord Mansfield had declared for a broader exclusion of either parent's testimony to that fact in all cases. The two rules were now harmonious; one was merely broader than the other. The broader now began to be followed, and for fifty years in England was accepted without question. By that time, the statutory abolition of married persons' incompetency (*ante*, chap. 620) led to a reconsideration of the question; and, for a time at least, the original and orthodox rule of R. v. Reading (but not limited to filiation cases) was revived. To what extent the law of England will pare down Lord Mansfield's innovation cannot be surely known from the modern rulings.

"In the United States, the original practice, so far as there is any report of it, was entirely in harmony with the orthodox rule of R. v. Reading, *i. e.*, it knew merely a rule of corroboration for married mothers in filiation or similar proceedings. But the circulation of Lord Mansfield's dogmatic pronouncement, in the treatises of the early 1800's, soon brought the new rule to the attention of our courts; and they seem usually to have accepted it with unquestioned faith. It may have become, in some jurisdictions, too deeply planted to be uprooted."

Again the same author, on page 388, chapter 2064, "Policy of the Rule," says:

"We learn, then, that the indecency or unseemliness lies in allowing a person to testify to an illicit connection, and that the immorality consists in allowing a parent to give testimony which will ruin his own child's legal status. The utterly artificial and false nature of the rule could not more forcibly appear than in the inconsistency of these '*ex post facto*' reasons. (1) There is an indecency, we are told. And yet, in nine cases out of ten, the sole question that the wife is asked is (for example) whether her husband was in St. Louis from 1849 to 1853 during the time that she was in New York. Is this indecent? Moreover, the very next question may be whether during that time she lived with the alleged adulterer; and this (by general concession) is indubitably allowable. In every

sort of action whatever, a wife may testify to adultery or a single woman to illicit intercourse; yet the one fact singled out as 'indecent' is the fact of non-access on the part of the husband. Such an inconsistency is obviously untenable. (2) There is an immorality and a scandal, we are told, in allowing married parents to bastardize their children. And yet they may lawfully commit this same immorality by any sort of testimony whatever, except to the fact of non-access. They may testify that there was no marriage ceremony, or that the child was born before marriage, or that the one party was already married to a third person, or their hearsay declarations (after death) to illegitimacy in general may be used. In all these other ways they may lawfully do the mean act of helping to bastardize their own children born after marriage. Where is the consistency here? Of what value is this conjuring phrase about 'bastardizing the issue,' if it will not do the trick more than once in a dozen times? Moreover, what shall be said of a system of law which, while thus rebuking parents who come to prove their children bastards, at the same time by its own inhuman prohibition (unique among civilized peoples) has refused absolutely to allow those parents, by any means whatever, to remove afterwards (by legitimation) the consequences of their original error and to give their innocent children the sanction of lawful birth * * * a refusal which is still maintained in most of our jurisdictions? That the same law which harshly fixed the stain of bastardy as perpetually indelible should censure parents for the abomination of testifying to that bastardy is preposterous.

"The truth is that these high-sounding 'decencies' and 'moralities' are mere pharisaical afterthoughts, invented to explain an otherwise incomprehensible rule, and having no support in the established facts and policies of our law. There never was any true precedent for the rule; and there is just as little reason of policy to maintain it."

See, also, *1 Wharl. Ev. (3d ed.) 188 § 608; Steph. Dig. Ev. (1904 ed.—Beers ed.) 496; Rapalje on Witnesses (1887 ed.) 272; Best Ev. (11th ed.—by S. L. Phipson, London, 1911) 568.*

In our own Evidence act (Revision of 1900) it will be noted that section 5 thereof, provides as follows:

"In any trial, &c., * * * the husband or wife shall be competent and compellable to give evidence the same as other witnesses * * * provided, that nothing herein shall render any husband or wife competent or compellable to give evidence for or against the other in any action for criminal conversation, except to prove the fact of marriage, or to render any husband or wife competent or compellable to give evidence against the other in any criminal action or proceeding, except to prove the fact of marriage, and except as now otherwise provided by statute, or compellable in any action

or proceeding for divorce on account of adultery to give evidence for the other, except to prove the fact of marriage, nor shall any husband or wife be compellable to disclose any confidential communication made by one to the other during the marriage."

It is to be noted that in each of the provisions of the act, with the exception of divorce cases and disclosure of confidential communications, the legislature used the words "competent" and "compellable" whereas in the latter two excepted instances it merely uses the word "compellable."

This is not a mere coincidence. Nor is it unusual or accidental. As indicated it appears twice, and in succession. It is clear that it was definitely planned. The act is a revision of the law of evidence. The legislature undoubtedly knew of the judicial interpretation given to the law on the subject as expressed by Lord Mansfield and legislated accordingly. It is the well settled law of construction, based on a sound policy, that where words in a statute have received judicial construction, the legislature will be deemed to have used them in the sense that had been thus ascribed to them. *Commercial Trust Co.* v. *Hudson County Tax Board, 87 N. J. Law 179* (at *p. 183*) ; *25 R. C. L. 992.* Under our act either spouse is competent but not compellable to give testimony for or against the other to prove adultery. It shall serve no useful purpose to cite authorities, suffice it to point out that our reports are replete with cases where either spouse testified against the other to prove the act of adultery and also to facts and circumstances which tended to prove inclination and opportunity to commit adultery and when corroborated, a divorce was granted. If it be not indecent, immoral or against public policy to so testify, it is difficult to understand how it becomes immoral, indecent or against public policy to do so under the circumstances of the instant case.

In so far as the bill of particulars are concerned, we think that so much of the bill of particulars as relates to the husband's petition was not properly admissible and should not be considered in arriving at a conclusion, for under our Evidence act the wife is not compellable to give testimony against

her husband. But we think that so much of the bill of particulars as relates to the counter-claim is competent, inasmuch as the wife herself testified in support of her claim, and therefore in justice her admissions, contrary to her interest and contention to an alleged cause of action which she sets up against her husband, should be admissible. The effect of the admissions contained in these bills of particulars in addition to the other proof adduced, would justify the dismissal of the wife's counter-claim, because striking out her contention that there was intercourse between them "the last week in March, 1929," which she herself withdrew when confronted with the records of the Plaza Hotel in Jersey City, where the intercourse was alleged to have taken place, she was left in the irrefutable position, contrary to all medical knowledge, of saying that the child born on December 9th, 1929, was either conceived in November, 1928, or in June, 1929, of the same year. The November contention is quite impossible. The June contention is likewise impossible because it is not consistent with the fact that the child was not a premature child but was a mature, nine-pound child when born.

As already stated, the advisory master, held in effect that he was bound by the Lord Mansfield rule. We desire to point out that this suggests the following question: Are English decisions rendered after the Revolution, i. e., decisions generally and decisions relating to statutes, binding on us? We think not. Before stating our reasons for our negative answer we desire to make clear that we, of course, give full consideration to the decisions of our mother country rendered by her prior and subsequent to the Revolution. This she merits and receives with greatest deference. The decision by Lord Mansfield was enunciated in 1777. This was subsequent to our separation from England. Under our constitution of 1776, paragraph 22, the common law of England remained in force. Under our constitution of 1844, article 10, paragraph 1, common law and statute law now in force, not repugnant to the constitution, remained in force until they were altered or repealed by the legislature. In our state it has been held that we are not bound by such a decision relat-

ing to statutes. *State* v. *Mairs*, cited in *1 N. J. Law 335* but to be found at page 385. See particularly note on pages 388 and 389 of said case. The following authorities and many others are to like effect. *15 C. J. 936 § 320; 5 R. C. L. 818.* See *In re Heaton's Estate, 5 Boyce 565; 96 All. Rep. 21.*

As to the binding effect on us of English decisions generally, rendered after the Revolution, as early as 1811, Mr. Justice Pennington, in the case of *Steward* v. *Chance, 3 N. J. Law *396,* held:

*"But as the case was adjudged since the Revolution and therefore not law here,* it is proper to pursue the subject further."

Particularly are we constrained to hold that such a decision is not binding on us where as in the instant case we feel that it leads to the suppression of truth and the defeat of justice.

We therefore decline to adopt the Lord Mansfield rule.

The decree dismissing the wife's counter-claim will be affirmed, and that portion of the decree dismissing the husband's petition will be reversed with directions to award him a decree *nisi* of divorce.

No. 152—

*For affirmance*—THE CHIEF-JUSTICE, TRENCHARD, BODINE, DONGES, HEHER, KAYS, JJ.   6.

*For reversal*—PARKER, CASE, PERSKIE, VAN BUSKIRK, HETFIELD, DEAR, WELLS, DILL, JJ.   8.

No. 190—

*For affirmance*—THE CHIEF-JUSTICE, TRENCHARD, PARKER, CASE, BODINE, DONGES, HEHER, PERSKIE, VAN BUSKIRK, KAYS, HETFIELD, DEAR, WELLS, DILL, JJ.   14.

*For reversal*—None.