HUDSON COUNTY COURT OF QUARTER SESSIONS.

THE STATE OF NEW JERSEY v. BERNARD N. McFEELY ET AL.

Decided April 29, 1947.

For the state, *Horace K. Roberson.*

For the defendants, *Edward J. O'Mara.*

DREWEN, C. P. J. This is a motion to quash an indictment for conspiracy at common law. (It is stipulated by the state that the indictment is not within the terms of our conspiracy statute, *R. S.* 2:119–1; *N. J. S. A.* 2:119–1, but is intended to be within those of *R. S.* 2:103–1; *N. J. S. A.* 2:103–1.)

The defendants are government officers of the City of Hoboken. They include the Mayor, the Director and Deputy Director of Public Safety, the chief and deputy chief of police, and divers superior officers of the city's department of police. The persons at whom the confederated purpose is charged to have been directed are described as patrolmen of the city's police, seventeen in number. The design of the conspiracy is charged, with all the necessary allegations of corrupt and evil purpose, to have been the coerced dismissal or resignation of the named patrolmen from their respective positions as policemen of the city. The means by which the stated purpose was planned to be accomplished are described and alleged as, among other things, unwarranted harassment, the making of false and groundless departmental charges, and various unjustified intimidations having reference to impoverishment, civil injury and other evil prospects. Numerous overt acts are alleged.

That the conspiracy statute, *supra,* does not displace conspiracy at common law would appear to be entirely settled. *State* v. *Norton,* 23 *N. J. L.* 33; *State* v. *Donaldson,* 32 *Id.* 151; *State* v. *Loog,* 13 *N. J. Mis. R.* 536; 178 *Atl. Rep.* 623; *affirmed, per curiam, sub. nom. State* v. *Henry,* 117 *N. J. L.* 442; 188 *Atl. Rep.* 918; *State* v. *Continental Purchasing Co.,* 119 *N. J. L.* 257; 195 *Atl. Rep.* 827; *affirmed, per curiam,* 121 *N. J. L.* 76; 1 *Atl. Rep.* (*2d*) 377; *State* v. *Ellenstein,* 121 *N. J. L.* 304; 2 *Atl. Rep.* (*2d*) 454.

The argument to quash concedes, in the survey of juristic development which it presents, that the earliest principles of common law conspiracy have been progressively amplified and extended; but it denies emphatically that the result of this is to include a charge like that made by the present indictment, which throughout their discussion is dealt with by defendants as a charge of conspiracy to do no more than civil injury to individuals. Whether in every case such a purpose must be adjudged insufficient as an element of criminal conspiracy at common law is beside the present question, but it is the court's opinion that the indicated view of the charge made by this indictment is altogether too narrow. In the survey of development already mentioned authorities are

cited by defendants as declaring the limits to which the development has gone. Out of these authorities we shall consider from among the objects stated as rendering a confederated purpose indictable, those which have a bearing on the controversy. (These, of course, are all in addition to combinations to commit crime and combinations having designs implemented by criminal means.) The indictable instances thus shown are those in which the purpose is to defraud an individual by fraudulent and indirect devices; or to prejudice the public or the government; or to use improper means to injure another's reputation; or to impoverish another in his trade or profession (*Wharton's Crim. L.* 486, *et seq.*). The question is, do the principles just stated, or the pronouncements of our own courts (*infra*), or both together, embrace the conspired purpose in the charge before us.

The argument of attack is made as if we had only to return to the orthodox by restoring the purity of texts. But strictly, there is no orthodox. The problem is that of rightly tracing the evolving course of common law on the subject in hand, from which it follows that our primary concern is to ascertain the phase to which the development of doctrine thus far has brought us rather than the exact terms of the primal doctrine itself. Some of the very texts defendants cite in their own support carry implicit evidence of the pressure of expanding change against which they were written. The learned brief submitted for the motion takes us back through far away centuries and into many an ancient book, but it will serve no useful purpose now to linger among the antiquities, and for a reason presently to appear.

There are plenty of judicial pronouncements that are in contemporaneous and direct conflict with what defendants urge. These are pronouncements by our own appellate courts. By them it is laid down that a conspiracy is indictable at common law where its intended result is the injury or oppression of individuals; or where the public interest is injuriously involved; or where the design is to cause civil injury, or unjustly to subject individuals to the power of the confederates. *State* v. *Norton*, 23 *N. J. L.* 33; *State* v. *Donaldson*, 32 *Id.* 151; *State* v. *Cole*, 39 *Id.* 324; *State* v. *Bienstock*,

78 *Id.* 256; 73 *Atl. Rep.* 530; *State* v. *Continental Purchasing Co., supra.*

Now defendants admit all of these pronouncements by our courts, but they would discount them *in toto* as *obiter dicta;* and in those instances where the precise adjudication is at variance with the attack now made, the decisions are said to be actually though not ostensibly in cases of statutory rather than common law conspiracy, or they are said to be without precedent and to be unsupported by the authorities they rely on. Whether the cases referred to are for the reasons stated truly without force as precedent will not, in the deciding of this issue, be called in question; the decisions themselves stand and are binding here. With regard to the so-called *obiter dicta,* an observation must be made. In an inquiry like this, *obiter dicta* do evince the thoughts and appraisals by which the courts expressing them are guided to their conclusion, and though they may not stand in close relation to the exact issue, they do have their part, nevertheless, in determining it and must be taken as disclosing an aspect of repugnance between life and the law as the same is contemplated by those whose duty it is judicially to declare the principle of accommodation revealed thereby. Not the sources of the common law, only its evidence is found in decisions and in texts; and the two are not always convertible terms. *Heise* v. *Earle,* 134 *N. J. Eq.* 393 (at *p.* 402); 35 *Atl. Rep.* (2d) 880. Also, the *obiter dicta* in question, if such they be, have been so repeatedly approved by our appellate courts as to command present adherence.

In overruling a long established principle of common law and supplementing it with one more consonant with modern considerations and requirement, our Court of Errors and Appeals has made this observation: "Great progress has been made in every field of human endeavor since 1777. Many and varied have been the changes. So has the law, from time to time, likewise undergone changes. Majestically the law always lends itself to an interpretation which results in the safeguarding and preservation of human and property rights. It is because law is based on reason and justice that it ultimately triumphs. The science of the law must not merely be

a pulsating and living factor but a virile, wholesome and ardent champion of truth and justice as well." *Loudon* v. *Loudon,* 114 *N. J. Eq.* 242 (at *p.* 246); 168 *Atl. Rep.* 840.

In saying the things we have and in quoting the foregoing passages it is not forgotten that we are dealing with the law of crimes. The purpose is to show the common law as capable of organic life. Striking workmen were once indictable as conspirators, and in defendants' brief there is a reference to "the now outmoded labor cases." Thus we see the common law, theoretically at least, in its spontaneous adaptability, and though in its interpretation no new crime may be created, it becomes fairly apparent that old ones may be pretermitted. The word of caution given in defendants' brief that the office of the court is to interpret law and not to make it has not been lost. Nor it is enough to say that while the court may define a common law crime it may not in doing so devise one, for it is altogether possible for a new definition to result in a new crime. The margin between defining and devising could be found deceiving and uncertain country. At any rate, there is no reason to be complacent about the clarity or simplicity of the answer to the question raised by this motion.

The expansive principles of common law conspiracy that have been cited, including those by our own courts, are stated in the abstract and in general terms. But the indictment itself is not abstract, it presents a concrete case, and we have been able to find no precedent, nor has any been brought to our notice, in which superior public officers have been indicted for criminal conspiracy arising out of the exercise of command and authority over their subalterns. For this reason and because of what we deem the over-confident belief of defense counsel that the factors in our problem are plain and calculable, we quote from the language of Chief Justice Beasley in *State* v. *Donaldson, supra,* as partly embodied in 12 *Corp. Jur.* 540, § 1: "It has been said that there is perhaps no crime an exact definition of which it is more difficult to give than the offense of conspiracy; a difficulty resulting in a large measure from the fact that the law on the subject of conspiracy, except where settled by legislative enactment, is, beyond certain limits, in a very uncertain state; the cases

beyond such limits, which have been adjudged to be conspiracies, appear, it has been said, 'to stand apart by themselves' and to be 'devoid of that analogy to each other which would render them susceptible of classification.' "

Let it now be remarked that what the state asks of this court is, in effect, that the court, a trial court, designate as a common law crime conduct whose character as such is imputed out of circumstances distinctly novel to the purpose. This should not be done lightly. What grounds are there for doing it at all? The answers given to this question represent the reasons which, in the judgment of this court, relate the allegations in the indictment before us to the broadened principles of common law conspiracy above set forth out of the opinions of our own appellate courts and standard juristic texts. The first reason appears from a reflection upon what the deficiencies of the law would be were the limitations of common law conspiracy what the defendants say they are. There is a double potentiality in the combination described by the charge here made; its possible consequences are not only private and personal, but also public and social. The first relate to the right of the patrolmen to pursue their means of livelihood and to carry on their chosen work in life without inimical interference or frustration like that alleged, and to their right to be free from "impoverishment in their trade;" and the second relate to a contaminated police morale or positive impairment of police protection, or both, either of which would amount to a definite prejudice to the public. A reflection like that suggested would appear to be an altogether legitimate approach to the problem. Chief Justice Beasley, whose opinions characteristically reveal a learned, philosophic sense of the common law, justified the broadening of the common law rule by those cases of criminal conspiracy which could not have been "sustained upon any other doctrine." *State* v. *Donaldson, supra* (at *p.* 153). Another impelling thought is that the ever tightening interdependence of men in modern society, economically and socially, presents more and more the need of minimum standards of mutual right and protection—within, of course, the principles stated— which the law can enforce. This consideration has in view

the nameless, devious and infinitely variegated and intolerable wrongs and oppressions rendered possible upon the combining for evil of the resources of many against one, or of many against a few. Then there is the very nature of conspiracy itself. "An act may be immoral without being indictable, where the isolated acts of an individual are not so injurious to society as to require the intervention of the law. But when immoral acts are committed by numbers, in furtherance of a common object, and with the advantages and strength which determination and union impart to them, they assume the grave importance of a conspiracy, and the peace and order of society require their repression." *State* v. *Burnham,* 15 *N. H.* 396. And "there are circumstances in which combinations of persons, for the promotion of evil, portend a danger, and call for legal interposition, when the single efforts of individuals might pass unnoticed by the law." 2 *Bishop's Criminal Law* (7th ed.), ¶ 180.

And lastly, a concerted, malicious scheme to drive men out of their employment and so deprive them of a means of livelihood, by the pressing of groundless charges of wrongdoing, very probably amounts to a combination to "defraud by fraudulent and indirect devices."

However, and all things else notwithstanding, it is urged upon the court that the duty and accompanying right of these defendants to impose discipline on those they are charged with oppressing renders the indictment a paradox in the law. They say further that the relation noted, in and of itself, disqualifies the allegations as sufficient to constitute a charge of criminal conspiracy. This objection at once brings to mind the opposing truism that the power to enforce discipline is normally the power to abuse or pervert it, and that where abuse or perversion ensue, it must, if for no better reason than the preservation of discipline and hence of the service itself, be rendered amenable to a higher authority, more especially where, as here, a vital public interest is involved. To this the reply is made that the law already provides the higher authority and *R. S.* 40:47–10; *N. J. S. A.* 40:47–10 is cited. We are not prepared to say that some complication of the problem might not thus arise. Concededly the respective

official positions of these defendants (appearing on the face of the indictment) vests in them the duty of authority and discipline over the subalterns named, and it cannot be that every excess or other departure from permissible standards of command that involves the conduct of plural actors shall amount to a criminal conspiracy. But returning to this particular indictment, it is the court's opinion, assuming the truth of the allegations as for present purposes we must, that the departure from permissible standards thus presented is matter not of degree only, but of kind.

There is nothing for this, the trial court, to do but declare in its discretion, and for the reasons set forth, that the indictment before it is included within the scope of the principles by which the common law of conspiracy is now broadened. To do otherwise would amount, in effect, to a multiple repudiation by this court of appellate decisions.

The motion to quash must be denied.