Commonwealth ex rel. Goldman, Appellant, *v.* Goldman.

Argued June 16, 1962. Before RHODES, P. J., WRIGHT, WOODSIDE, WATKINS, MONTGOMERY, and FLOOD, JJ. (ERVIN, J., absent).

*Arthur C. Thomas,* for appellant.

*James J. Boyle,* with him *Ettinger, Gallagher & Silverman,* for appellee.

OPINION BY WOODSIDE, J., September 14, 1962:

We are here called upon to decide whether the Uniform Act on Blood Tests to Determine Paternity, enacted July 13, 1961, P. L. 587, 28 P.S. §307.1 et seq., applies to an action brought for the support of minor children born during wedlock.

The petitioner is seeking support from her husband for herself and her three children. The parties were married May 29, 1948, and separated March 17, 1958. A divorce action is now pending. The petitioner gave birth to three children: Michael, on September 20, 1953, Gerry on December 16, 1957 and Claudette on November 19, 1959. She brought this action against her husband on August 9, 1960. Without taking testimony, the court entered a temporary order on December 2, 1960 and amended it on August 1, 1961. Prior to the taking of testimony relating to the entry of a "permanent" order, the defendant filed a petition denying paternity of the two younger children and praying for an order requiring submission of the necessary parties to blood grouping tests. After the filing of an answer by the wife and an argument on the question, the court directed the necessary parties to submit to the tests. This appeal followed.

There are three children involved in this case. The defendant does not question the paternity of the oldest child and an order of support for Michael must be made. The defendant does deny paternity of the second child who was conceived and born while the parties lived together, and the youngest child who was conceived and born after the parties separated.

The question of compulsory blood grouping tests was last before the appellate courts, a few years ago when the Act of May 24, 1951, P. L. 402, was in effect. That act authorized the court, in any proceeding to establish paternity, to order the parties therein to submit to blood grouping tests. It was held not to apply to actions brought for the support of minor children born during wedlock. *Commonwealth ex rel. O'Brien v. O'Brien*, 390 Pa. 551, 136 A. 2d 451 (1957).[1]

We believe that the Uniform Act of 1961, which repealed the above act of 1951, does apply to actions for the support of minor children born during wedlock. Section 1 of the Uniform Act provides that blood grouping tests may be ordered by the court "In a civil action in which paternity parentage or identity of a child is a relevant fact," and §6 provides, "This act shall apply to criminal cases . . ." Section 5 provides, "The presumption of legitimacy of a child born during wedlock is overcome if the court finds that the conclusions of all the experts as disclosed by the evidence based upon the tests show that the husband is not the father of the child."

The action here, as in the *O'Brien* case, was brought under §733 of The Penal Code of June 24, 1939, P. L. 872, as amended, 18 P.S. §4733. Mr. Justice COHEN, speaking for the Court, said in the *O'Brien* case, p. 555, "The present proceeding is one in which paternity is *relevant* . . . but it is not a proceeding brought to *establish* paternity." The Act of 1951 provided for compulsory blood grouping tests in proceedings "to establish paternity," while the Act of 1961 provides for such tests in actions in which paternity parentage "is a relevant fact." It is evident by this change of language that the legislature intended by the 1961 Act to extend

---

[1] Both appellate courts divided four to three in this case. See opinions of the Superior Court, 182 Pa. Superior Ct. 584, 128 A. 2d 164 (1956), along with the Supreme Court opinions cited above.

the compulsory blood grouping tests to proceedings not covered by the Act of 1951.[2] Furthermore, §5, supra, providing that the presumption of legitimacy of a child born during wedlock is overcome by certain evidence of blood tests, establishes that the act is applicable where the paternity of children born during wedlock is a relevant fact.

We are not impressed by the argument of the appellant that the act, although applicable to both civil and criminal actions, is not applicable to this proceeding because it has been referred to as a "quasi-criminal" action. See *Commonwealth ex rel. Highland v. Highland,* 159 Pa. Superior Ct. 633, 636, 49 A. 2d 529 (1946). The act applies to both civil actions and criminal cases and is applicable to those proceedings which have some characteristics of both civil actions and criminal cases.

Section 5 of our blood tests act of 1961 is identical (except for an unimportant comma) with the uniform act recommended by the National Conference of Commissioners on Uniform State Laws.[3] The report of the commissioners on this section states as follows: "A new provision referred to in Section 5 has been drawn relating to children born in wedlock claimed to be illegitimate. Most states have a strong presumption of legitimacy—in fact, a conclusive presumption of legitimacy of children born in wedlock except in such situations as impotency, non-access, and a child of a different race. As to all other situations, the child is conclusively presumed to be legitimate when born in wedlock. This is based on social policy today. It has also been influenced by the difficulty of proof with certain-

[2] See article by Judge ALTON A. McDONALD of the Cambria County Court of Common Pleas in the October 1961 Pennsylvania Bar Association Quarterly, Vol. 33, p. 76.

[3] For reference to the commission (of which our colleague Judge WRIGHT is a member) and its work, see *Commonwealth v. Coyle,* 190 Pa. Superior Ct. 509, 515, 154 A. 2d 412 (1959).

ty. Where blood tests could determine with absolute accuracy the non-paternity of a child born in wedlock, the presumption should yield. Therefore, this Act is drawn to include those cases." 9 U.L.A. 109.

The Uniform Act contains the provision that "This act shall be so interpreted and construed as to effectuate its general purpose to make uniform the law of those states which enact it." By including this provision, our legislature is directing us to examine the decisions of other states interpreting the act. The Uniform Act was enacted and became effective in the following states on the following dates: California, 9/9/53; Illinois, 7/8/57; New Hampshire, 4/29/53; Oregon, 5/7/53 and Pennsylvania, 7/13/61.

An examination of the relatively few cases interpreting the Uniform Act leads to the conclusion that the courts of the states which adopted the Uniform Act with §5 are of the opinion that it applies to actions brought to obtain support for minor children who were born during wedlock. See *State v. Sargent*, 118 A. 2d 596 (N.H. 1955).

In enacting the Uniform Act, California and Oregon omitted §5, supra. The Supreme Court of California notes this omission in deciding that issue of a wife "cohabiting" with her husband, who is not impotent, is indisputably presumed to be legitimate. See *Kusior v. Silver*, 354 P. 2d 657, 667 (Cal. 1960). This holding was based upon a specific California statute which provides: "Notwithstanding any other provision of the law the issue of a wife cohabiting with her husband, who is not impotent, is indisputably presumed to be legitimate." §1962 of Cal. Code: *Kusior v. Silver*, supra, p. 659. (This case held that the conclusive presumption of legitimacy applied only when the man and woman were living together ostensibly as husband and wife and does not apply to cases where there is merely access or the reasonable possibility of access.)

New York has not adopted the Uniform Act but has a provision in its law requiring compulsory blood group tests "Wherever it shall be relevant to the prosecution or defense of an action." In *Anonymous v. Anonymous,* 150 N. Y. S. 2d 344 (1956), an order directing the parties to submit to blood tests was affirmed in a case involving children born during wedlock. The husband had been living with the wife as her husband during the time of conception and birth. See also *C v. C,* 109 N. Y. S. 2d 276 (1951) and *Foglio v. Foglio,* 176 N. Y. S. 2d 43 (1958). New Jersey, too, accepts blood grouping test reports to overcome the presumption of legitimacy. See *Cortese v. Cortese,* 76 A. 2d 717 (N.J. 1950).

There is, of course, a strong presumption of legitimacy in Pennsylvania, but this presumption was held to be rebuttable even before the legislature provided so in §5, supra. *Dennison v. Page,* 29 Pa. 420 (1857) ; *Cairgle v. American Radiator & S. S. Corp.,* 366 Pa. 249, 255, 77 A. 2d 439 (1951). It has been deemed rebuttable by evidence of non-access or lack of sexual intercourse or impotency which is clear, direct, convincing and unanswerable. *Cairgle v. American Radiator & S. S. Corp.,* supra, p. 256. The legislature has now added another method of rebutting the presumption. Section 5, supra, provides that the presumption is overcome if the court finds that the blood grouping tests of all the experts discloses that the husband is not the father of the child. The courts are not at liberty to ignore this provision.

Actions challenging the paternity of children born during wedlock have long been a bothersome question for the courts. At common law a child born of a married woman was at first conclusively presumed to be legitimate unless her husband was not within the four seas which bounded the kingdom, but later it was held that the presumption of legitimacy could be overcome

if the husband and wife lived at a distance from each other so that access was very improbable. This was the rule applied in Pennsylvania in 1814. *Commonwealth v. Shepherd*, 6 Binney 283, 286. There the Court said, "When the husband has access to his wife, it is right that no evidence short of absolute impotence of the husband, should bastardize the issue." p. 286. Even at this early date absolute impossibility of access was not required. p. 288.

In *Dennison v. Page*, supra, 29 Pa. 420, 423 (1857) the court said, "By the term access, used in this sense, we understand actual sexual intercourse; and this is presumed in the [case of a child conceived after its mother's marriage] from the existence of the marital relation, and in the [case of a child conceived before its mother's marriage] from the subsequent marriage."

Thus the question was not whether the husband and wife had access in the sense that they saw each other or visited each other, but whether they had sexual intercourse. See *Cairgle v. American Radiator and S. S. Corp.*, supra, 366 Pa. 249, 255, 77 A. 2d 439 (1951). This was difficult to prove because of the rule that neither the wife nor the husband were allowed to testify to non-access. This ancient rule[4] has been followed in Pennsylvania to the present time[5] although it has been severely criticized by Wigmore[6] and has been abandoned in many jurisdictions.[7]

During the time that these rules were becoming firmly fixed in our law, there was no way to determine

---

[4] It originated from dictum advanced by Lord Mansfield in *Goodright v. Moss*, 2 Cowp. 591 (1777).

[5] See *Commonwealth v. Carrasquilla*, 191 Pa. Superior Ct. 14, 16, 155 A. 2d 473 (1959).

[6] Wigmore on Evidence, 3rd Edition, Vol. VII, §2063.

[7] See *Loudon v. Loudon*, 168 A. 840 (N.J. 1933); *Peters v. District of Columbia*, 84 A. 2d 115, 119 (1951); *Moore v. Smith*, 172 So. 317 (Miss. 1937); *Nulman v. Cooper*, 207 P. 2d 814 (Colo. 1949).

the paternity of a child whose mother had intercourse with more than one man within the period of conception. Blood grouping tests, contraceptive methods, artificial insemination, reliable medical information on sterility, and other scientific knowledge which will enter into future consideration of these and related rules concerning paternity were then unknown.

If the presumptions and evidential exclusions to support legitimacy were founded solely upon the inability to determine the paternity of a child born during wedlock, the courts should have required blood grouping tests to rebut these presumptions without legislative action. But the legal rules devised to support legitimacy were also based upon an evident desire of the courts to preserve the sanctity of the family. The rules were deemed "essential in any society in which the family is the fundamental unit," and were "founded in good morals and public decency." *Commonwealth ex rel. O'Brien v. O'Brien,* supra, 390 Pa. 551, 556, 136 A. 2d 451 (1957) ; *Tioga County v. South Creek Township,* 75 Pa. 433, 437 (1874).

Although it might be appropriate to re-examine all of the rules relating to legitimacy and to put them in harmony with both recently expressed legislative intent and modern scientific knowledge, we do not intend to here tamper with the rule preventing the husband and wife from testifying to non-access.

We recognize that there is something disgusting about a husband who, moved by bitterness toward his wife, suddenly questions the legitimacy of her child whom he has been accepting and recognizing as his own. Except in rare situations the rules of evidence have heretofore prevented his doing this. By providing a new method to overcome the presumption of legitimacy, the legislature has opened avenues to a husband to question the paternity of his wife's children which never before were available to him.

We think that his right to question the paternity is not unlimited. Where the husband has accepted his wife's child and held it out as his own over a period of time, he is estopped from denying paternity. 31 C.J.S. Estoppel §110. This rule has never been applied in Pennsylvania, primarily because the strict rules relating to the evidence necessary to overcome the presumption of legitimacy kept the questions of estoppel and laches from becoming an issue. There is, of course, "adoption by estoppel" which prevents a parent questioning the legality of an adoption in cases where the parent recognized the parental relationship. *Appeal of Wolf*, 10 Sadler 139, 13 A. 760 (Pa. 1888); *Bergman v. Carson*, 284 N.W. 442 (Iowa 1939); 31 C.J.S. Estoppel §110; *Holloway v. Jones*, 246 S.W. 587 (Mo. 1922); *In re: McKeag*, 74 P. 1039 (Cal. 1903), 27 A.L.R. 1365. If the principle of estoppel is applicable to an adopted child, it should be applicable to a child born to the wife of a person who acknowledges the child to be his.

The appellant argues that the defendant accepted these children as his own by voluntarily supporting them during part of their lives and by demanding and receiving rights of visitation when the temporary order of support was entered. She further argues that his failure to question his paternity of the children before the temporary order was entered prevents his raising it thereafter.

The third child was conceived and born subsequent to the separation. The defendant left the wife approximately three months after the birth of the second child. In his petition he admits paternity of the oldest child but denies paternity of the other two. It does not appear from the record before us that the defendant is guilty of laches, nor of such conduct as would estop him from denying paternity. See *Anonymous v. Anonymous*, supra, 150 N. Y. S. 2d 344, 348 (1956). He, there-

fore, under the Act of 1961, supra, is entitled to an order requiring blood grouping tests of the parties involved.

. It is suggested that the Act of 1961 is defective in that its subject is not "clearly expressed in its title" as required by Article 3, Section 3 of the Pennsylvania Constitution. The act's title is as follows: "An act authorizing the court to order the parties under certain circumstances to submit to blood grouping tests under certain conditions and the effect thereof." Section 9 of the Act setting forth that the "act shall be known and may be cited as the 'Uniform Act on Blood Tests to Determine Paternity' " is not the title nor a part of the title to which reference is made in Art. 3, §3 of the Constitution. In the title of the Act of 1961, there is no limitation of the court's authority to "proceedings to establish paternity" as there was in the title of the Act of May 24, 1951, P. L. 402.

The title of an act need not be an index of its provisions, nor a synopsis of its contents. It is sufficient if it gives notice of its tenor to interested persons of a reasonably inquiring state of mind; and so long as the title indicates a general subject to which the provision involved is germane or incidental, the provision itself is sufficiently contained therein. *Harrisburg v. Pass,* 372 Pa. 318, 93 A. 2d 447 (1953).

A title to a statute need name only the real subject of the legislation and need not enumerate incidental provisions if germane to the legislation as a whole. *Lancaster City Annexation Case (No. 1),* 374 Pa. 529, 98 A. 2d 25 (1953) ; *In re Gumpert's Estate,* 343 Pa. 405, 23 A. 2d 479 (1942). The title of a statute need name only the real subject of the legislation, and need not set forth all enactments intended to be made in regard thereto. *Annenberg v. Roberts,* 333 Pa. 203, 2 A. 2d 612 (1938). It is not the function of the title of a bill to catalogue the results which may flow from its en-

actment into law. A short general comprehensive title is more desirable than a long one which attempts to point out all the details of a statute. *Reber's Petition,* 235 Pa. 622, 84 A. 587 (1912); *Minsinger v. Rau,* 236 Pa. 327, 84 A. 902 (1912).

Any person with an inquiring mind, upon reading the title to the above blood test act of 1961, would be on notice that the act provided for compulsory blood grouping tests and had provisions relating to the use and effect of such tests. Without limiting the parties who may be ordered to submit to the tests, all parties must look to the provisions of the act to see who the legislature intended to include within the act's provisions, and what effect the tests would have on their cases. All the provisions of the act are germane to the requiring and effect of blood grouping tests.

Order affirmed.

CONCURRING OPINION BY WRIGHT, J.:

We held in *Commonwealth ex rel. O'Brien v. O'Brien,* 182 Pa. Superior Ct. 584, 128 A. 2d 164, affirmed 390 Pa. 551, 136 A. 2d 451, that the Act of May 24, 1951, P. L. 402, 28 P.S. 306, was not intended by the legislature to require blood grouping tests in an action for support of a child born during wedlock. The legislature subsequently repealed the Act of 1951, and adopted the Uniform Act on Blood Tests to Determine Paternity. Act of July 13, 1961, P. L. 587, 28 P.S. 307.1 et seq. In view of this apparent change in legislative intent, I concur in the result.

DISSENTING OPINION BY MONTGOMERY, J.:

I cannot concur in the broad interpretation given by the majority to the statute under consideration (Act of July 13, 1961, P. L. 587, 28 P.S. §307.1 et seq.). Such

an interpretation would justify the use of blood grouping tests to negate paternity not only in cases of fornication and bastardy, and actions for support of a bastard child, approval for which was given under the 1951 Act in *Commonwealth ex rel. O'Brien v. O'Brien,* 390 Pa. 551, 136 A. 2d 451, but would also countenance its use on the motion of any party to the litigation in those other cases enumerated by Mr. Justice COHEN in his opinion in that case, namely: husbands bringing an action for divorce on the ground of adultery, actions for annulment because of fraudulent representations as to parenthood, mothers seeking custody of children, parties seeking a determination that they are the parents of a child of whom another claims to be the father, parties disputing the claim of a child to share in an estate, parties attempting to prove non-citizenship of a child, defendants in prosecutions for rape in which the prosecuting witness testified that as a consequence of the rape she became pregnant and gave birth to a child, as well as others not mentioned.

Although the body of the 1961 Act may indicate the intention of the Legislature to have blood grouping tests used in all cases, I find nothing in the title of the Act which in any reasonable way indicates that intention. The short title of the Act makes no change in its objective from the objective of the 1951 Act. The short title describes it as a "Uniform Act on Blood Tests *to Determine Paternity.*" (Emphasis ours.) The underlined words are *identical* with those used in the 1951 Act which the *O'Brien* case limited to those two cases previously mentioned. Looking to the general title, we find nothing more than a bestowal of authority on the court "to order the parties under certain circumstances to submit to blood grouping tests . . ." and providing ". . . the effect thereof." Thus the main objective, as expressed in this general title, is the authorization of blood tests, and except for the phrase

"the effect thereof", no mention is made of any intention to unsettle or change the laws of inheritance, as to presumptions of legitimacy of children born in wedlock, or any of the other subjects previously mentioned. I cannot subscribe to an interpretation that would make this statute so clearly violative of article 3, section 3, of the Pennsylvania Constitution providing that "No bill, except general appropriation bills, shall be passed containing more than one subject, which shall be clearly expressed in its title."

This provision of our Constitution has been the subject of consideration in many cases. Certain principles have been well established concerning it, viz.: The title of an act must be considered as part of it; it limits its scope, and may properly be resorted to as an aid to its construction, *Wilkes-Barre v. Pennsylvania Public Utility Commission,* 164 Pa. Superior Ct. 210, 63 A. 2d 452; although the title need not be an index or synopsis of its contents, nevertheless it must sufficiently and fairly give notice of the real subject of the act so as reasonably to lead to an inquiry into what is contained in the body of same; and the court cannot look beyond the title and into the body of the bill to determine its validity. *Stewart v. Hadley,* 327 Pa. 66, 193 A. 41; *Phillips's Estate,* 295 Pa. 349, 145 A. 437.

Applying these rules to the present situation, I find nothing in the title of this Act indicating that the General Assembly intended to extend its application beyond that which the Supreme Court in the *O'Brien* case gave to the 1951 Act. There is nothing to indicate its extension to all cases, civil and criminal; there is nothing to indicate that the right to demand a blood test is given to everyone involved in the litigation; there is nothing to indicate that it is applicable in every case where paternity is a *relevant factor;* there is nothing to indicate that it is applicable to all the types of proceedings previously mentioned.

I appreciate that questions, even though constitutional in nature, which are not raised in the court below may not be considered on appeal. *Rome Township Referendum Recount Case,* 397 Pa. 331, 155 A. 2d 361. However, I do not think this principle precludes a consideration of the title in arriving at a proper interpretation of a statute. *Wilkes-Barre v. Pennsylvania Public Utility Commission,* supra.

It appears to me that the majority is reading into the title of the Act a main objective or purpose not expressed therein, viz., that in every case of litigation, civil or criminal, in which paternity, parentage, or identity of a child is a relevant fact, the long established rule that children born in wedlock are presumed to be legitimate is legally rebutted if the results of a blood test or a blood group test establish that the alleged father could not be the real father of the child; whereas the real object as set forth in the title is to bestow power upon the courts to authorize blood tests under certain circumstances. I cannot give to the phrase "the effect thereof" the broad meaning given by the majority to include the objectives I have just stated and to cover all of the subjects previously mentioned. In my opinion, these words fail to reasonably indicate the vast changes in the law which will result from the view adopted by the majority. If its view is adopted, then, in every proceeding, civil or criminal, wherein paternity, parentage, or the identity of a child is involved (the child may be an infant or a septuagenarian), the charge of illegitimacy may be raised by any party to the litigation. Families may live together for many years before this charge is asserted. This is clearly against all reason, common sense, and morals, in the light of the sanctity which we have given to the family unit in our way of life.

In order to recognize the Act of 1961 as a proper constitutional enactment, and using its title to limit

the scope of its effect, I would give it the same interpretation as was given to the 1951 Act in the *O'Brien* case. I would reverse the order of the lower court in authorizing a blood grouping test and would deny the petition for same.

I respectfully dissent.

WATKINS, J., joins in this dissent.