Commonwealth ex rel. Hall, Appellant, *v.* Hall.

Argued June 10, 1969. Before WRIGHT, P. J., WATKINS, MONTGOMERY, JACOBS, HOFFMAN, SPAULDING, and CERCONE, JJ.

*Harry J. Oxman,* with him *Silverberg and Oxman,* for appellant.

*Henry N. Fineman,* for appellee.

OPINION BY WRIGHT, P. J., September 11, 1969:

This appeal arises as the result of a petition filed by Mildred Hall requesting that an order be entered against her former husband, Albert S. Hall, for the support of a child, Lisa, born July 14, 1965. Albert filed an answer denying paternity, together with a petition requesting blood grouping tests. On January 29, 1969, the court below entered an order requiring these tests, and Mildred has appealed.

The record discloses that Albert and Mildred were married on July 22, 1961. Thereafter they lived together until January, 1965, at which time Mildred left the home. Three months later there was a reconciliation, and the parties resumed marital cohabitation. As previously indicated, Lisa was born July 14, 1965. The

parties finally separated in November, 1967, the child remaining with the wife. On May 23, 1968, a separation agreement was executed, paragraph No. 4 of which is set forth in the footnote.[1] On June 18, 1968, Mildred instituted divorce proceedings, and a final decree was granted in October, 1968. Since Albert had stopped making support payments, Mildred filed a petition, December 3, 1968, requesting that a support order be entered for Lisa. In his answer denying paternity, Albert alleged that he had entered into the separation agreement upon advice of counsel, and that he had reasonable grounds to doubt that Lisa was his child.

Albert's petition requesting blood grouping tests was filed under the Uniform Act on Blood Tests to Determine Paternity. Act of July 13, 1961, P. L. 587, 28 P.S. 307.1 et seq. The allegations in this petition are set forth in the opinion below as follows: "In summary, they are that, for a year prior to the birth of the child, the wife was constantly visited by a certain named individual, a man, at the home of the parties, against defendant's instructions and frequently without his knowledge. The defendant worked at the

---

[1] "4. WIFE shall have the custody, care and charge of LISA, daughter of the parties, during her minority, with the right of visitation granted to HUSBAND on a mutually convenient basis. At the outset the parties agree that LISA shall, on every Saturday morning, be brought to WIFE'S parents' home where HUSBAND shall pick her up and return her at a reasonable hour. When the child becomes a little older, HUSBAND shall be granted longer visitation periods, with the possible arrangement for week-long vacations. HUSBAND shall pay One Hundred Dollars ($100.00) per month on the first day of each month for the support, maintenance, education and medical care of LISA. HUSBAND agrees to maintain BLUE CROSS for LISA, as well as policy of insurance for her college education. WIFE agrees to have HUSBAND notified in the event LISA becomes ill or injured, and HUSBAND shall be consulted as to course of treatment to be utilized".

post office from 9:00 p.m. to 6:00 a.m. This led to the separation of the parties about six months prior to the birth of the child, which separation lasted for about three months, after which the parties reconciled and the wife returned home. The child was born three months later and, shortly thereafter, the named male individual again began visiting the home of the parties in defendant's absence and staying until the early hours of the morning. The final separation occurred . . . when the defendant came home early one morning in November, 1968, and was admitted by his wife, who was entirely in the nude, and found the named male individual in the kitchen in his underwear. The defendant further avers, upon information and belief, that the named male individual has admitted paternity of the child".

Our analysis of appellate decisions dealing with the requirement of blood grouping tests in actions for child support properly commences with the case of *Commonwealth ex rel. O'Brien v. O'Brien*, 182 Pa. Superior Ct. 584, 128 A. 2d 164. We therein held, in an opinion by the writer affirming an order of the Municipal Court entered by our present colleague, the Honorable THEODORE O. SPAULDING, that the husband did not have the right to demand blood grouping tests under the Act of May 24, 1951, P. L. 402, which related to proceedings to establish paternity, because that statute was not intended to apply to actions for support of children born during wedlock. Our decision was affirmed by the Supreme Court. See *Commonwealth ex rel. O'Brien v. O'Brien*, 390 Pa. 551, 136 A. 2d 451.

The next case to come before us was *Commonwealth ex rel. Goldman v. Goldman*, 199 Pa. Superior Ct. 274, 184 A. 2d 351. In the meantime, the legislature had repealed the Act of 1951, and had adopted the Uniform

Act.[2] Mrs. Goldman had given birth to three children. No question was raised as to the oldest child, but the husband denied paternity of the two younger children. An order directing blood grouping tests was affirmed. However, in his opinion for the majority, Judge WOOD-SIDE said: "We think that his right to question the paternity is not unlimited. Where the husband has accepted his wife's child and held it out as his own over a period of time, he is estopped from denying paternity . . . It does not appear from the record before us that the defendant is guilty of laches, nor of such conduct as would estop him from denying paternity". The present writer concurred in the result because of the apparent change in legislative intent.

One year later we were presented with the appeal in *Commonwealth ex rel. Weston v. Weston*, 201 Pa. Superior Ct. 554, 193 A. 2d 782. Two children were born to Mr. and Mrs. Weston while they were living together as husband and wife. There was no suggestion that the husband did not accept these children as his own. An order requiring blood tests was reversed on the ground that the husband was estopped from denying paternity. In his opinion for this court Judge WOOD-SIDE made the following statement: "There is something inherently repulsive about a man questioning the paternity of children who were conceived by his wife and born to her while he was living with her and who were accepted and held out to the world by him as his children until his and his wife's personal differences led to a support action". The present writer filed a dissenting opinion on the ground that insertion of the doctrine of estoppel in the statute was judicial legislation.

---

[2] This statute provides that, in actions in which paternity is a relevant fact, the court, upon motion of any party, "shall order the mother, child and alleged father to submit to blood tests".

The rule announced in the *Weston* case has not been altered either by legislation or appellate decision. The opinion was handed down on September 12, 1963. Allocatur was refused by the Supreme Court on December 2, 1963, 201 Pa. Superior Ct. xxvii. Only one appellate case on the subject has since been decided. In *Commonwealth ex rel. Nedzwecky v. Nedzwecky,* 203 Pa. Superior Ct. 179, 199 A. 2d 490, we affirmed an order refusing to require blood tests to resolve the paternity of a child involved in a support proceeding. The decision in that case, opinion by the present writer, was based upon the doctrine of res judicata. In his opinion in the instant case, the learned judge below also mentions *Commonwealth ex rel. Miller v. Dilworth,* 204 Pa. Superior Ct. 420, 205 A. 2d 111, reversed 431 Pa. 479, 246 A. 2d 859, but that case turned on the question whether it was proper for a judge to determine the paternity of an illegitimate child without a jury trial.

We are of the opinion that the present appeal is ruled by the *Weston* case. Lisa was conceived while Albert and Mildred were living together as husband and wife. She was born more than two years before her parents separated. During that period her paternity was never challenged, and there is no suggestion that Albert did not accept Lisa as his own child. Indeed, he executed a separation agreement by the terms of which he acknowledged that Lisa was his daughter, provided for her future support, and made extensive arrangements for visitation rights. Since the doctrine of estoppel has been written into the Uniform Act, it should be applied in the instant factual situation.

Order reversed.

---

DISSENTING OPINION BY HOFFMAN, J.:

I dissent on two grounds.

I

In my opinion this appeal is interlocutory and should be quashed.

I recognize, of course, that in *Commonwealth ex rel. Goldman v. Goldman*, 199 Pa. Superior Ct. 274, 184 A. 2d 351 (1962), and in *Commonwealth ex rel. Weston v. Weston*, 201 Pa. Superior Ct. 554, 193 A. 2d 782 (1963), we allowed appeals from orders of a lower court requiring that a wife submit to a blood test in a support case. Nonetheless, I believe that our prior rulings in this regard are in error.

In *Weston* we stated "that the motion to quash should be dismissed under the authority of Myers v. Travelers Ins. Co., 353 Pa. 523, 46 A. 2d 224 (1946)," at 558. In *Myers* the lower court made absolute a rule by defendant to stay proceedings until plaintiff submitted to a physical examination. We held that, "(t)he effect of making the rule absolute was to preclude plaintiff from further action." At 525. Consequently, this appeal was allowed. This decision was based on the general principle of law that "(u)nless an appeal from an interlocutory order is allowed by statute, a decree to be final and appealable must preclude the complaining party from further action in the court making such decree (citing cases)." At 525.

There is nothing in the instant case, however, which precludes further action by either party. Merely because the wife must submit to the test does not bar the proceedings from continuing nor does it deny her the opportunity to win an award of support for her child.

Moreover, there would appear to be little possibility that an appeal as to this question will be necessary.

Should the court find for the mother, any further appeal as to correctness of its prior ruling requiring

the blood test would be moot. Conversely, should the court find for the husband, an appeal as to this question would only lie if the test had excluded the husband.

In light of the probability that no appeal will be taken in such a case, therefore, there would appear to be little need to interrupt the proceedings in the lower court and seek a decision from us as to a matter which may be moot at the conclusion of the trial. The woman, who brought the petition for support should be prepared to submit to the test immediately, after noting her objection, and allow the proceedings to proceed in normal fashion. Only after it is determined that the results of the blood test are adverse to her position, and an order for the husband has been entered in the lower court, should she be permitted to appeal this matter.

An additional consideration raised in *Myers* is that an appeal should be allowed at this time because a person's body is inviolate and should not be subjected to the insertion of a needle.

This concept, however, was rejected by the legislature in enacting the blood test acts. This legislation does not consider a blood test to constitute a serious invasion of a person's body. Thus, the considerations in *Myers*, as expressed in 1946, have now been repudiated.

We now recognize that the minimal discomfort arising out of such scientific tests will often allow the court to reach results based on a greater knowledge of the facts. Similarly, in *Schmerber v. California*, 384 U.S. 757 (1966), the Supreme Court of the United States held that the drawing of blood from an accused in a criminal case does not violate his right to due process or his right against self-incrimination.

The blood test is, in effect, no more than another useful means of discovery. We would ordinarily not

allow an appeal from an order of the lower court directing a party to answer interrogatories or submit to a deposition. There is nothing so unusual, strenuous or dangerous about a blood test which should give it preferred status.

## II

Since the court feels obliged to reach the merits in this case, however, I believe it advisable to express my views in the matter.

First, I believe that President Judge WRIGHT's dissenting opinion in *Weston* is entitled to greater weight than he accords it here. In that opinion, Judge WRIGHT correctly pointed out that the Uniform Act on Blood Tests to Determine Paternity, which replaced the prior Act, allowed blood tests in actions for support for children born during wedlock. Judge WRIGHT concluded, at that time, that the insertion of the doctrine of "estoppel" constituted judicial legislation. In my opinion, Judge WRIGHT's evaluation was correct and accurately reflects my view of the matter.

In the revised Act the legislature clearly attempted to change the law and allow a husband to overcome the presumption of legitimacy of a child born during wedlock. This trend may also be noted in decisions of our Supreme Court. See *Commonwealth ex rel. Leider v. Leider*, 434 Pa. 293, 254 A. 2d 306 (1969). Thus our holding in *Weston* served to resurrect past doctrine and subvert the obvious intention of the legislature.

The tendency in our age is to seek scientific proof, both in the criminal and civil area. We now realize that decisions made on the basis of a judge's determination as to the credibility of the parties is inexact. Particularly in paternity cases, where the parties themselves may not know the actual identity of the father,

such scientific evidence is critical. In my opinion, any rule of law which excludes scientific evidence and asks us to rely solely on the intuition and judgment of a judge alone is undesirable.

Finally, the doctrine of estoppel, as applied in these cases, is based on a misconception of the doctrine. Estoppel is found where one party, acting in reliance on the actions of another, has altered his position to his detriment.

The alleged detriment which underlies the estoppel notion in these paternity cases was explained in Judge WOODSIDE's majority opinion in *Weston*. Judge WOODSIDE there stated:

"There is something inherently repulsive about a man questioning the paternity of children who were conceived by his wife and born to her while he was living with her and who were accepted and held out to the world by him as his children until his and his wife's personal differences led to a support action. . . .

"The children of this case are relatively young, but if a compulsory blood test may be ordered in this case it may be ordered in a case involving older children. It is unfortunate for a child when circumstances cause it to doubt its paternity, but it is cruel for the law to inject such doubts into a child's mind when there are no circumstances to support the doubts except an allegation by an irate man who previously had been known to the child and the world as its father.

"It is the taking of a blood test, and not the result of it, which does the harm. The test cannot prove paternity. Pricking the skin to get the blood is an act which plants indelibly upon the mind of a child the doubt as to its paternity which it will carry thereafter forever."

I believe that the consideration set forth in Judge WOODSIDE's opinion cannot serve as the basis for an estoppel.

Judge WOODSIDE holds that an absolute rule prohibiting blood tests where an estoppel is found is necessary as to all children, regardless of age, because older children may be involved. In short he concedes that the blood test will not cause serious psychological problems for a young child. His whole theory of detriment, as to them at least, is irrelevant. Thus, the court, in effect, incorporates estoppel into the statutory scheme, and then proceeds to apply it even in these instances where, admittedly, there is no reliance or harm.

Moreover, Judge WOODSIDE's great concern with older children would seem to be relatively unimportant. Virtually all paternity cases involve children who are young and unaware. Thus, in *Weston*, Judge WOODSIDE admitted that the child, being under four, would probably not suffer psychologically from the test. In *Goldman*, the children whose paternity was questioned were both under the age of four when the tests were requested. In the instant case, the child is barely four.

In those few cases involving older children, I sincerely doubt that the "pricking of the skin," to which Judge WOODSIDE attached great psychological significance, is significant at all. Certainly, if the child is old enough to understand that the issue of his paternity is involved, a blood test itself would not seem to be particularly important. In short, I believe that the court has denied the very valuable use of blood tests in paternity cases out of an undue regard for the improbable reaction of an imaginary child. I suggest that the court's fears in this regard are groundless.

Finally, the fact that the husband in this case remained at home for a period of two years after the birth of the child does not, standing by itself, prejudice the child in whose favor an estoppel must be found. Proof of the child's paternity, which is the basis

for a support order, is not necessarily made more difficult by the passage of time during which the husband lived at home. While it is possible that such may be the case, we cannot speculate that this has occurred.

Here, the court has not found that the child, if determined to be illegitimate, would be unable to obtain support from its putative father. Only in such instances, however, would the child be harmed by the failure of the husband to contest his support obligation at an earlier date. Thus, no harm has been established on which an estoppel can be raised. *Edelman v. Boardman*, 332 Pa. 85, 96, 2 A. 2d 393 (1938).

In summary, I believe that the court's reference to estoppel is founded on faulty doctrine and seeks to create a bar against overcoming the presumption of legitimacy where none was intended to exist. It forces us to disregard valid scientific testimony and rely on guesswork. It denies courts full access to all information which will allow them to reach a conclusion based on all of the facts. Such a rule, in my opinion is unwise and should be discarded.

I would affirm the lower court's decision.

SPAULDING and CERCONE, JJ., join in this dissenting opinion.