364 A.2d 1307

**In re ADOPTION OF Robert Dale YOUNG.**

**Appeal of Robert E. GOODLING and
Judy S. Goodling.**

Supreme Court of Pennsylvania.

Argued May 3, 1976.

Decided Oct. 20, 1976.

144

Arnold, Slike & Bayley, Edgar B. Bayley, Camp Hill, for appellants.

Sylvia H. Rambo, Carlisle, for appellee, Robert R. Young.

Before JONES, C. J., and EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

OPINION OF THE COURT

JONES, Chief Justice.

The instant appeal brought by Judith (Young) Goodling, the natural mother of Robert Dale Young, and her second husband, Robert E. Goodling, presents a most difficult and highly disturbing familial morass. Mrs. Goodling appeals from the Decree of the Court of Common Pleas of Cumberland County, Pennsylvania, Orphans' Court Division, denying her petition seeking the involuntary termination of parental rights of Robert R. Young, wherein she alleges pursuant to Section 311(3) of the Adoption Act [1] that Mr. Young, her first husband, "is

1.  1970, July 24, P.L. 620, No. 208, Art. III, § 311(3); 1 P.S. § 311(3).

the presumptive but not the natural father of" Robert Dale Young. Mr. Goodling appeals from that same Decree which also denied his petition under Section 401 of the Adoption Act [2] seeking to legally adopt Robert Dale Young.

Briefly, avoiding any detailed vagaries revealed on the record, appellant Judith Goodling and appellee Robert Young were married in 1966. During the period of this marriage, and prior to separation, the subject child, Robert Dale, was born; his birthdate being October 11, 1969. Mrs. Goodling testified [2a] that during the month of January in 1969 she was having frequent sexual relations with appellant Robert E. Goodling and that during that same period, when it is approximated that conception occurred, she and appellee Young had sexual intercourse only once. The relevance of this testimony relates to Mrs. Goodling's assertion that appellee Young is not the natural father of Robert Dale but rather that appellant Goodling, her present husband, fathered the child.

According to Mrs. Goodling's own testimony, it was not until five months after the boy's birth that she first verbalized her belief as to the true parentage of her son. At that same time, she separated from her first husband and began living with appellant Robert Goodling. Mr. Goodling was separated from his first wife as well. The youngster remained in the custody of his mother.

A private separation agreement between appellee and appellant Mrs. Goodling was entered into on August 13, 1971, wherein provision for the child's support was set forth. At no time were any child support proceedings brought against Robert Goodling. Moreover, while the record reveals that the medical expenses relating to the

2.  1970, July 24, P.L. 620, No. 208, Art. IV, §§ 401, 402, 411, 414; 1 P.S. §§ 401, 402, 411, 414.

2a.  Section 313 of the Adoption Act provides:
"The natural mother shall be a competent witness as to whether the presumptive father is the natural father of the child." 1970, July 24, P.L. 620, No. 208, Art. III, § 313; 1 P.S. § 313.

birth of Robert Dale were paid for by Mr. Goodling, who at that time was appellee's employer, the appellee signed a note in exchange for the money. Appellee testified that the loan was necessary as he did not carry any medical insurance. The loan has never been repaid however.

Appellee Young and appellant Mrs. Goodling were divorced in December of 1971. Mr. Goodling obtained a divorce from his first wife in April of 1973. Appellants were married to each other in May of 1973.

Appellee continued throughout to support Robert Dale pursuant to the August 1971 separation agreement and appellants accepted this money without any demonstrated hesitation until after their marriage. Appellee continued to send weekly support checks until June of 1974 when Mrs. Goodling returned to him, without explanation, one full year of support checks by mail.

One last incident is necessary to add to this saga; that is, in April of 1973, prior to Mr. Goodling's divorce from his first wife, appellee Young filed a habeas corpus petition regarding custody of the youngster. Upon receiving notice of this action, Mrs. Goodling and the child moved out of Mr. Goodling's house and went to live with her parents. The Cumberland County Common Pleas Court, Orphans' Court Division, entered an Order dated April 4, 1973, awarding custody of the child to his mother with temporary custody and visitation rights in Robert Young.[3]

### I. Petition Seeking the Involuntary Termination of Parental Rights in Robert R. Young

Appellant Judith (Young) Goodling's petition under Section 311(3) of the Adoption Act, *supra*, fails in that the facts as proven on the record are insufficient to establish that appellee "is the presumptive but not the

---

3. The Orphans' Court judge presiding over the instant action also heard and decided the habeas proceeding.

natural father of" Robert Dale Young. Mrs. Goodling had petitioned the court below to order appellee to submit to the taking of blood grouping tests along with the child and both appellants. That court correctly refused to make such an order on the ground that the doctrine of estoppel bars Mrs. Goodling's present action questioning the paternity of her son.

Pennsylvania has enacted the "Uniform Act on Blood Tests to Determine Paternity," Act of 1961, July 13, P.L. 587, § 1 *et seq.*; 28 P.S. § 307.1 *et seq.*, in the belief that such tests, which make possible a scientifically reliable determination excluding paternity, may be helpful in those actions "in which paternity . . . is a relevant fact, . . ." [4]

Prior legislation in Pennsylvania granting the authority for court-ordered submission to blood grouping tests was held applicable only to bastardy proceedings. *See* Act of 1951, May 24, P.L. 402, § 1; 28 P.S. § 306; *Commonwealth ex rel. O'Brien v. O'Brien,* 390 Pa. 551, 136 A.2d 451 (1957). Whereas the 1951 Act spoke in terms of proceedings "to establish paternity," however the 1961 Uniform Act makes reference to use of blood tests in actions in which "paternity is a relevant fact." In *Commonwealth ex rel. Goldman v. Goldman,* 199 Pa. Super. 274, 184 A.2d 351 (1962), the Superior Court held that the Act's new language extended the evidentiary use of blood tests to child support proceedings where the minor child was born during wedlock. It cannot be doubted that the instant action before us today is also one in

4. The blood grouping tests do not reveal the identity of the father but rather establish "with scientific accuracy [. . .] that one is not the father of a certain child." McDonald, Blood Grouping Tests—A New Act In Pennsylvania, 33 Pa.B.A.Q. 76 (1961). The reliability of such expert methods has deservedly received legal recognition. *McDonald, supra,* at 80, 82. *See also Commonwealth v. Coyle,* 190 Pa.Super. 509 at 514–517, 154 A.2d 412 at 415–16 (1959).

which "paternity is a relevant fact" and therefore that the 1961 Uniform Act is applicable.

The right to question paternity is not unlimited however. The Superior Court first articulated the notion of restricting a party's right to request blood grouping tests under the 1961 Uniform Act in order to exclude the possibility of paternity in *Commonwealth ex rel. Goldman v. Goldman, supra.* Petitioner-wife had filed an action against her estranged husband in *Goldman* seeking support for herself and her three minor children born during wedlock. The defendant's response was to deny paternity of the two younger children and to request a court order requiring the parties to submit to blood grouping tests. While the Superior Court affirmed the lower court's authorization of the blood tests in that particular case, Judge Woodside's majority opinion noted the appropriateness of invoking the doctrine of estoppel against a husband who "has accepted his wife's child and held it out as his own over a period of time, . . ." 199 Pa.Super. at 283, 184 A.2d at 355.[4a]

The doctrine of estoppel suggested in *Goldman* was expounded upon and applied in *Commonwealth ex rel. Weston v. Weston*, 201 Pa.Super. 554, 193 A.2d 782 (1963). The Superior Court was motivated by the belief that children, especially older children, cognizant of the purpose and import of blood grouping tests, should not be made to cope with unanswerable doubt as to paternity unless circumstances are presented to the court other than a mere "allegation [denying paternity] by an irate man who previously had been known to the child and the world as its father." *Id.* at 556, 193 A.2d at 783. The court reversed the lower court's summary grant of the

4a. Mr. Goldman had left his wife shortly after the birth of the second child and prior to the birth of the third. The Court stated: "It does not appear from the record before us that the defendant is guilty of laches, nor of such conduct as would estop him from denying paternity." *Goldman, supra,* 199 Pa.Super. at 283, 184 A.2d at 355.

defendant-husband's petition seeking blood tests in that support case, stating:

"Here, the defendant had lived with his wife for several years after the birth of both children. There is no suggestion that he did not accept them as his children prior to filing his petition. [. . .] We think [the lower court] should have refused the petition of the defendant, at least until it was shown that the defendant had not supported and accepted these children as his own."

*Id.* at 557–558, 193 A.2d at 783.

Later, the Superior Court had occasion to reaffirm the reasoning developed in *Weston* and again applied the doctrine of estoppel after noting that since the *Weston* decision, neither the legislature nor this Court had acted contrary to such application of the doctrine in cases involving the 1961 Uniform Act. In *Commonwealth ex rel. Hall v. Hall,* 215 Pa.Super. 24, 257 A.2d 269 (1969), defendant Albert Hall had alleged in his petition seeking blood grouping tests an adulterous relationship existent between his ex-wife and a certain named male beginning prior to the birth of the subject minor child such as to give Mr. Hall reasonable grounds to doubt that Lisa was his daughter. The Superior Court ruled that court-ordered blood grouping tests were inappropriate where the estranged couple had not separated until the child, born while they cohabited, was over two years of age. The court continued:

"During that period [the daughter's] paternity was never challenged, and there is no suggestion that Albert did not accept Lisa as his own child. Indeed, *he executed a separation agreement by the terms of which he acknowledged that Lisa was his daughter, provided for her support, and made extensive arrangements for visitation rights.* Since the doctrine of estoppel has

been written into the Uniform Act, it should be applied in the instant factual situation."

*Id.* at 29, 257 A.2d 271.[5]  (Emphasis added).

■ The instant appeal wherein appellant Judith Goodling seeks under Section 311(3) of the Adoption Act to terminate the parental relationship between her former husband and the child born during the period of that marriage is novel.  Prior judicial interpretation of Sections 311(1) and 311(2) actions seeking the involuntary termination of parental rights on the grounds of abandonment and neglect respectively provides us with the initial postulate that, in view "of the irreversible nature and serious emotional impact which necessarily follows an involuntary termination of parental rights," we must proceed most gingerly.  *See, In re Orwick's Adoption,* 464 Pa. 549, 555, 347 A.2d 677, 680 (1975); *In re Fritz,* 460 Pa. 265, 271, 333 A.2d 466, 469 (1975); *In re Adoption of McAhren,* 460 Pa. 63, 68, 331 A.2d 419, 422 (1975); *Sarver Adoption Case,* 444 Pa. 507, 509–10, 281 A.2d 890, 891 (1971).

As we have already stated, the 1961 Uniform Act is applicable to a Section 311(3) action.  Prior appellate case law reviewing authorization of court-ordered blood tests under the 1961 Uniform Act, which we note parenthetically has also not yet been passed upon by this Court to date, has dealt with situations where husbands seeking to avoid support obligations by denying paternity petitioned for the taking of blood grouping tests.  We believe the Superior Court's decisions in the series of cases beginning with *Goldman* however are applicable to Mrs. Goodling's present appeal.

■ Mrs. Goodling cohabited with appellee Young as his wife prior to and for five months following the birth

5.  *See additionally Commonwealth v. Phillips,* 52 Pa.D. & C.2d 764 (1971) (estoppel applicable); *Commonwealth v. Carter,* 43 Pa.D. & C.2d 157 (1967) (blood grouping tests ordered).

of Robert Dale. Although after separating from Young in March of 1970 she took up residence with Mr. Goodling, the man she now claims to be the natural father of her child, nevertheless, Mrs. Goodling accepted and cashed child support money from the appellee up until at least June of 1973. For one full year thereafter, she accepted appellee's support payments, accumulating them until June of 1974 at which time she returned his checks without explanation. The August 1971 separation agreement between Mrs. Goodling and the appellee refers to the latter as the father of Robert Dale. We cannot condone the Goodlings' actions in continuing to accept child support from appellee for over three years, while today, married, they conveniently allege that all along they believed Robert Goodling to be the natural father of the child. Were the situation reversed and appellee Young to answer today in a proceeding against him seeking to enforce support payments for the minor child under the 1971 separation agreement, there is no doubt that the doctrine of estoppel would prevent his belated questioning of paternity.

Moreover, we heavily stress the fact that while Mrs. Goodling well had the earlier opportunity to allege that Young was not the natural father of the child during the April 1973 habeas corpus proceeding, she remained silent. The final Order awarding custody of the child in Mrs. Goodling and temporary custody with visitation rights in Robert Young acknowledges appellee as the *natural* father of the child.[5a] It is of no avail to the Good-

**5a.** The Order of the Court of Common Pleas, Orphans' Court Division, of Cumberland County, entered April 4, 1973, reads as follows:

"AND NOW, April 4, 1973, at 3:20 o'clock, P.M., custody of the minor child, Robbie Dale Young, born October 11, 1969, be awarded to the natural mother, Judy S. Young with temporary custody and visitation in the *natural father*, Robert R. Young alternate weekends from 8:00 A.M. Saturday until 6:00 P.M. Sunday and whoever has custody of the said child on Sunday is to see the child attends a Church School, the *natural father* will also have custody for four weeks during the summer vaca-

lings today to claim that fear of losing custody of the child back in 1973 due to their living arrangements motivated their silence. The doctrine of collateral estoppel most certainly acts to bar appellant Judith Goodling's present action questioning the paternity of her son. *Cf. Commonwealth ex rel. Nedzwecky v. Nedzwecky*, 203 Pa.Super. 179, 199 A.2d 490 (1964); *Burrell Adoption*, 57 Pa.D. & C.2d 74 (1974); *Jensen v. Jensen*, 13 N.J.Super. 155, 80 A.2d 244 (1951).

As an aside, we lastly feel it important to mention that no reasonable inference can be taken from the fact that appellee Young has exercised his right and prerogative to refuse to submit voluntarily to blood grouping tests. It may well be his feeling that after all of these years, he declines to dignify the Goodlings' accusations with such a response.

Appellee Young has maintained and lovingly carried out his duties as Robert Dale's father, accepting the child as his natural offspring since birth. Likewise, as far as concerns the child's world, appellee is his father and he is entitled to maintain faith in and gather strength from that important relationship.

tion to be divided into two two-week periods, those visitations to be exercised by giving the natural mother notice by June 1st of the two two-weekly periods the said *natural father* wishes to exercise said privilege and the periods will commence on the Saturday morning at 8:00 A.M. and end 14 days later at 8:00 P.M.

In addition, the *natural father* is granted custody of the minor from 1:00 P.M. until 8:00 P.M. alternately on his birthday, Easter, Fourth of July, Labor Day, Thanksgiving and Christmas.

In addition, it is ordered and directed the natural mother not take the child out of the jurisdiction of the Commonwealth of Pennsylvania without permission of the Court except on normal vacation periods and in no event will the child be in the presence of Robert Goodling, nor Robert Goodling appear at the grandparents home while the child remains there. This order is subject to review at any time that the natural mother is not living with the child at her parents' home. Also, visitation shall be at such other times as the parties may agree.

It is further ordered and directed the natural mother to have the child examined by a pediatrician and a report sent to counsel for the *natural father*." (Emphasis added).

## II.  Petition Seeking to Adopt
Robert Dale Young

The denial of appellant Robert Goodling's petition under Section 401 of the Adoption Act, *supra,* must be affirmed as well.  We do so for reasons other than those expressed by the court below however.

Section 401(7) requires that the petition to adopt attach as exhibits all consents necessary to the adoption set forth under subsections (1) and (2) of Section 411. These include the consent of "[t]he adoptee, if over twelve years of age; [and] [t]he adopting parent's spouse, unless they join in the adoption petition; . . . ." The appellant's petition itself is, in this context, procedurally satisfactory.  However, Section 411(3) requires that for the adoption to be approved, consent to an adoption shall be required of,

"The parents  .  .  .  of an adoptee who shall not have reached the age of eighteen years." [6]

■   Although Mr. Goodling obviously has the consent of Robert Dale's mother, Judith Goodling, it is also clear that appellee Young does not consent.  Had Judith Goodling's petition seeking to involuntarily terminate appellee's parental rights succeeded, then appellee Young's consent could have been dispensed with under Section 414 of the Act:

"Consent of a parent to adoption shall not be required if a decree of termination with regard to such parent has been entered."

*See also In re Adoption of D. J. L., Jr. and D. W. L.,* 64 Pa.D. & C.2d 295 (1973).  *Cf. Burrell Adoption,* 57 Pa. D. & C.2d 74 (1971).

---

**6.**  Although this Court recently struck down as unconstitutional that portion of Section 411 pertaining to the rights of unwed fathers vis a vis adoption proceedings, the remainder was not affected.  *See Adoption of Patricia Jeanine Walker,* 468 Pa. 165, 360 A.2d 603 [filed July 6, 1976 fn. 10].

This not being the case, however, the adoption must be denied.

Decree of the court below denying appellant Judith (Young) Goodling's petition under Section 311(3) of the Adoption Act and appellant Robert E. Goodling's petition under Section 401 of the Adoption Act is hereby affirmed.

Appellants to bear costs.

POMEROY, J., filed a dissenting opinion.

MANDERINO, J., filed a dissenting opinion and also joins in the dissenting opinion filed by POMEROY, J.

POMEROY, Justice (dissenting).

The Court today holds that the doctrine of estoppel may bar a mother from seeking to terminate involuntarily the parental rights of her former husband on the ground of non-paternity. Act of July 24, 1970, P.L. 620, § 311(3), 1 P.S. § 311(3) (Supp.1976–77). Because I believe that the doctrine of estoppel should not be applied in involuntary terminations proceedings, I dissent.

The doctrine of estoppel is applied "to prevent a party from assuming a position or asserting a right to another's disadvantage inconsistent with a position previously taken." *Blofson v. Cutaiar,* 460 Pa. 411, 417, 333 A.2d 841, 843 (1975); see also *Sabino v. Junio,* 441 Pa. 222, 272 A.2d 508 (1971); *In re Estate of Tallarico,* 425 Pa. 280, 228 A.2d 736 (1967). The doctrine is rooted in concepts of justice and fairness and serves to prevent a party from asserting a claim of self-interest on the basis of a fact which he had previously misrepresented. Were the instant action one which involved solely the vindication of a personal interest of Mrs. Goodling, I would agree that her actions towards her former husband were of the sort which ought to give rise to an estoppel. But an involuntary termination proceeding is not such an action, and I cannot subscribe to its application here.

A court may decree an involuntary termination of parental rights only when non-paternity, parental abandonment, neglect or abuse is demonstrated *and* when it is deemed in the best interest of the child to do so. *In re Adoption of R. I.,* 468 Pa. 287, 299 n. 12, 361 A.2d 294, 300 n. 12 (1976). Conceptually, an involuntary termination proceeding concerns not only the self-interest of the parent, but important interests of the child as well. As this court has recently noted:

> "In termination proceedings, unlike delinquency proceedings, the child's interest is usually represented by the contending parties. His interest is, of course, to be provided adequate parental care and subsistence. He has a right to remain with a natural parent who is providing that care and who wishes to continue the parent-child relationship. In such a case, the parent represents the child." *Matter of Kapcsos,* 468 Pa. 50, 58, 360 A.2d 174, 178 (1976).

By sealing the lips of Mrs. Goodling in this case the Court, in my view, silences a voice necessary for the complete representation of the child's interests. The consequence of doing so is to deprive the child of a judicial inquiry into whether grounds exist for the judicial involuntary termination of his presumed father's rights as a parent on the ground of non-paternity, and whether or not, in the light of the evidence which would otherwise be adduced, it is in the best interests of the child that termination be ordered. The Court suggests that there exists a childlike unquestioning assumption of Robert Dale that the appellee is in truth his natural father which should not be disturbed, and that the child should be able to maintain faith in and gather strength from that important relationship. Aside from being conjecture, this is only a part of the total picture; a court cannot make an informed and intelligent evaluation of all relevant factors bearing on termination if it deliberately eschews knowledge of a factor which the legislature has expressly made a permissible ground for termination.

The provisions of the involuntary termination statute were enacted to protect the children of this Commonwealth. By foreclosing consideration of possible grounds for involuntary termination on the basis of one parent's past transgressions the Court today in a real sense visits the sins of the parent (here, the mother) upon the child.

MANDERINO, J., joins in this dissenting opinion.

MANDERINO, Justice (dissenting).

I join in the dissenting opinion of Mr. Justice Pomeroy. In addition, I would like to voice my objection to the majority's unjustified judicial amendment of the Adoption Act. Section 411(3) requires the consent of the adoptee's *"parents"* before an adoption will be approved unless the *parents'* rights to the child have been involuntarily terminated pursuant to the Adoption Act. The majority, however, holds that appellee, Robert Young, is a "parent by estoppel." The clear implication of the majority opinion is that the consent of a "parent by estoppel" is required *even if that person is not the natural parent.*

Moreover, even if we assumed the propriety of the majority's use of the estoppel concept against appellant, Judith Goodling, it should not be used against appellant, Robert Goodling: he was not a party to the support agreement; he did not receive any support payments; nor was he a party to the custody proceeding. These considerations therefor should not be used to *estop* appellant Robert Goodling from exercising his statutory right to question whether appellee is the natural father of the child.