**Melissa W. v. Steven M.**

C.P. of Cumberland County, no. 881 SUPPORT 1989.

*Michael Rundle,* for plaintiff.
*Gerald Shekletski,* for defendant.

HESS, *J.,* January 4, 1995—The parties in this support case were married in December of 1987. They underwent a final separation in 1992 and have since divorced.

Melissa W. has remarried. In July of 1989 the parties were separated for a period of approximately one month. During that time period, the plaintiff had sexual intercourse with another man. She did, however, have sexual relations with her husband in the months when they lived together, though not for several weeks prior to separation. The record is silent as to whether the parties used contraception during that time period.

In August of 1989 the parties effected a reconciliation. Either at the time they discussed the reconciliation or began to resume cohabitation, Ms. W. advised her husband that she had had sex with another man and was then pregnant. During a proceeding for spousal support, docketed to the same caption as the instant motion, the defendant denied liability for the support of the plaintiff due to the fact that she was expecting a child to another man. Our order of December 15, 1989, reflected that the plaintiff admitted that fact. Accordingly, her complaint for support was dismissed.

Despite Melissa's apparent infidelity, Mr. M. agreed to the reconciliation intent upon residing with mother and child as a family. Ethan was born on March 24, 1990. Mr. M. stayed with his wife throughout the delivery. Mr. M.'s name was placed on the child's birth certificate without his objection. Notice that a son had been born to Steven and Melissa M. was subsequently published, with Mr. M.'s knowledge, in a list of birth announcements at his place of employment, Kinney Shoes. On September 2, 1990, 5-month-old Ethan was dedicated at the Bowmansdale Church of God, a service at which Mr. M. held himself out to be Ethan's father. When the parties lived together, Mr. M. took "his son" to sporting events. Mr. M. claimed Ethan as an exemption on the joint income

tax returns of the parties filed in 1990 and 1991. In the trailer park where the M.s resided, there was some gossip to the effect that Steven was not the father of Ethan. The source of these rumors was uncertain. Mr. M. admitted to his mother that he was not Ethan's father. At the hearing of this case, Mr. M. was asked, at some length, why it was that he did not correct the public impression that he was the father of the child. A sample response is as follows:

"Q. And at the hospital you did tell the people in the hospital you were the father of the child?

"A. I gave him the name of mine because we were married. I was against the wall. I tried to do the right thing.

"Q. You allowed your name to be listed on the birth certificate as the father?

"A. Right.

"Q. And you saw the article in the Kinney newsletter indicating that you and Melissa had had a child together, didn't you?

"A. Literally speaking, yes, but I never came outright and said that this is my child.

"Q. Nor did you ever go to correct that, did you?

"A. I have no means or education on the law on what to go about doing. I figured she made a mistake. And it was early in our marriage, that hopefully, truthfully ...

"Q. My question to you is did you ever go to anybody over there at Kinney where you worked that published the newsletter and say that was a mistake, change it, that's not my son?

"A. No. They must have taken it right out of the paper or something, because I never told them to put it in.

"Q. But you never told them to correct it either, did you?

"A. What was I going to do, tell them to put [the real father's name] on it, that I work in the same work place?" Notes of testimony, pp. 8-9.

Since the parties' final separation in 1992, Mr. M. has had no contact with Ethan. Despite his ex-wife's pleadings, he refuses to visit with the boy. He, credibly, explained his earlier acceptance of Ethan as an attempt to solidify reconciliation with his wife by creating the bonds of family. Now that the parties are separated, he does not feel that it is just that he be called upon to support a child without knowing with certainty that the child is his. Since the separation of the parties, Ms. W. has lived with other men whom Ethan has, on and off, referred to as "daddy." This support action has been brought well after the defendant ceased to conduct himself as the child's father.

Before the court is the petition of Steven M. requesting that the parties and the minor child submit to a blood-grouping test pursuant to the Uniform Act on Blood Test to Determine Paternity, 23 Pa.C.S. §5104. As noted by the Superior Court in *McCue v. McCue,* 413 Pa. Super. 71, 604 A.2d 738 (1992):

"Three issues commonly arise in cases concerning paternity when the marriage of the mother and presumed father is a fact which becomes controlling. First is the presumption of legitimacy (or child of the marriage). Cases which ruled on this presumption attribute to it the status almost of substantive law, which must be rebutted by

clear and convincing evidence before a blood test is relevant. *Michael H.* [491 U.S. 110, 109 S.Ct. 2333, 405 L.Ed.2d 91 (1989)], *Donnelly* [409 Pa. Super. 341, 597 A.2d 1234 (1991)], *John M.* [524 Pa. 306, 571 A.2d 1380 (1990)] *and Scott* [394 Pa. Super. 411, 576 A.2d 67 (1990)]; *Ware v. McKnight,* 368 Pa. Super. 502, 534 A.2d 771 (1987); *Matter of Montenegro,* 365 Pa. Super. 98, 528 A.2d 1381 (1987); *Seger v. Seger,* 377 Pa. Super. 391, 547 A.2d 424 (1988); *Ermel v. Ermel,* 259 Pa. Super. 219, 393 A.2d 796 (1978); *Adoption of Young,* 469 Pa. 141, 364 A.2d 1307 (1976).

"Secondly is the estoppel of a parent from testifying to paternity by a person other than the husband or rebuttal of the presumption of legitimacy. *Seger [supra], Weston* [201 Pa. Super. 554, 193 A.2d 782 (1963)] *and Goldman* [199 Pa. Super. 274, 184 A.2d 351 (1962)]. This occurs when the parents, in the course of the marriage and thereafter, treat the child as their own and subsequently one or the other attempts to repudiate paternity.

"Finally is the issue of collateral estoppel or res judicata. *Commonwealth ex rel. Coburn v. Coburn,* 384 Pa. Super. 295, 558 A.2d 548 (1989); *Commonwealth ex rel. Palchinski v. Palchinski,* 253 Pa. Super. 171, 384 A.2d 1285 (1978); *Adoption of Young, supra;* and *Commonwealth ex rel. Nedzwecky v. Nedzwecky,* 203 Pa. Super. 179, 199 A.2d 490 (1964). These cases hold that a legal determination of paternity for custody or support purposes, unappealed from, forecloses any further litigation on that issue." *McCue, supra* at 76-77, 604 A.2d at 740-41.

Our review of numerous appellate cases dealing with this area of the law discloses no case with facts similar to those at bar. The above principles, particularly those

having to do with the presumption of legitimacy and estoppel, would appear to very much militate against granting the petitioner relief in this case. A closer look at the factual background of the various cases in this area belies that suggestion.

The case of *McCue v. McCue, supra* was one in which a former wife sought a paternity determination in order to deny her former husband visitation. In that case, the Superior Court held that the wife was estopped from denying her husband's paternity of a child conceived and born during their marriage where both parties had held the husband out as the father. In that case, the court found that the husband had the benefit of a presumption that the child was born to the marriage of the parties, that the presumption had not been rebutted, and, in any event, as we have just said, the wife was estopped from questioning paternity. For these reasons, blood test results were held to be, simply, irrelevant in this custody case.

Similarly, in *Gulla v. Fitzpatrick,* 408 Pa. Super. 269, 596 A.2d 851 (1991), a mother questioned the paternity of a putative father, again for the purpose of challenging his right to partial custody. In that case, the parties were never married. Nonetheless, the Superior Court held that the mother was estopped from questioning paternity where the mother, even prior to the birth of the child, actively led others to believe that Gulla was the child's father and where she accepted the father's assistance and financial support for the child and even obtained a support order against the father and accepted payments thereunder. This was a case in which the putative father had developed a close bond with the child which began at birth and continued throughout the proceedings.

In *John M. v. Paula T.*, 524 Pa. 306, 571 A.2d 1380 (1990), the putative father of a child born to a married woman sought to compel her husband to submit to blood testing to assist in a determination of paternity. The Supreme Court of Pennsylvania held that the trial court acted properly in refusing to order the husband to submit to blood tests. The Supreme Court resolved the case by reconciling the presumption that a child born to married persons is a child of the marriage with the Uniform Act on Blood Test to Determine Paternity, formerly 42 Pa. C.S. §§6131-37 (1982), now 23 Pa.C.S. §5104 (1990). In construing the statute, the court said:

"Indeed, section 6133 of the Act does not give the putative father the *right* to compel a presumptive father (husband) to submit to blood tests. That section provides: 'In any matter ... in which paternity ... of a child is a relevant fact, the court ... upon motion of any party ... shall order the mother, child *and alleged father* to submit to blood tests.' 42 Pa.C.S. §6133. [The] Superior Court has previously interpreted section 6133 as affording no right to an 'alleged father' in appellee's situation to compel a 'presumptive' father-husband to submit to a blood test....

"If appellee's 'right' to compel the presumptive father to submit to blood tests cannot be found in the Act, where can it be found? The Superior Court gleaned such right from those cases holding that an unwed father has procedural and substantive due process rights and cannot be denied access to the courts to prove or disprove his paternity or to assert his interest as a parent....

"The Superior Court overemphasized the rights and interests of the alleged father and minimized the rights and interests of others involved in and affected by its

decision, namely the mother, her husband, the family unit and the Commonwealth. When we factor in those rights and interests, we find that the scales weigh heavily in this case in favor of appellants and against court-ordered blood tests." *John M., supra* at 315-16, 571 A.2d at 1385. (emphasis in original)

A reading of this case makes it clear that the Supreme Court laid to rest, adversely to the petitioner, the right of a putative father to compel a presumptive father to submit to blood tests. Just as in the other cases which we have discussed, however, the problem posed by this case, namely the rights of the presumptive father (husband) to compel blood tests was not addressed.

In several cases written by our county judges, the presumption of legitimacy and principles of estoppel have been discussed relative to petitions seeking blood testing. In *Fisher v. Fink,* 42 Cumb. L.J. 385 (1992), a custody case, one Joseph Fisher Sr. was married to the mother of the child involved. He had acknowledged his paternity of the child in a court proceeding and during the child's entire life had held her out to be his daughter. Judge Bayley went on to conclude that the plaintiff, Joseph Fisher Jr., was thus estopped in his request for a court order subjecting mother, child, husband and plaintiff to blood testing.

In *S.M.H. v. K.R.E.,* 43 Cumb. L.J. 262 (1994), Judge Oler, similarly, ruled that blood tests should have been excluded from a paternity trial of a child arguably fathered by the defendant at a time when the plaintiff was married to who, in Judge Oler's opinion, is given the initials J.H. When the plaintiff married J.H., he accepted the premise that the child that his wife was carrying was his. He permitted his name to be placed on the birth certificate and thereafter lived with the

child and not only supported her, but provided her with love and affection. The father/daughter relationship which existed between J.H. and the child apparently remained undisturbed even throughout the support case in which K.R.E. was accused of being the father. Judge Oler found that, despite the physical resemblance between the child and the defendant, the presumption that J.H. was the father had not been overcome. Equally important, Judge Oler found that the plaintiff, mother, was estopped from contesting J.H.'s paternity under the circumstances.

*P.C.S. v. J.E.B. v. R.A.S.,* 43 Cumb. L.J. 347 (1994), was an opinion written by the undersigned. In that case, the plaintiff P.C.S. brought a support action against the defendant J.E.B. J.E.B., in turn, joined the husband of the plaintiff, R.A.S., as an additional defendant. Indeed, the plaintiff and additional defendant were married and living together at the time of the birth of the child in question. The husband R.A.S., underwent a vasectomy in 1989. As in the case sub judice, the husband and wife separated. During that separation the wife had a sexual liaison with another man, the defendant, J.E.B. Also as in this case, the parties attempted a reconciliation. In that case, we dealt largely with the question of overcoming the presumption of legitimacy. Given the vasectomy and the fact that subsequent tests revealed that R.A.S. was aspermatic, we had no difficulty in reaching the conclusion that it had been established, by clear and convincing evidence, that the husband was not the father of the child. We, however, had no need to discuss the question of estoppel inasmuch as, upon learning that his wife was pregnant to another man, R.A.S. refused to remain married to P.C.S. upon learning that his wife intended to keep the child.

All of the foregoing cases have in common a request by someone *other than* the husband/presumptive father that there be blood testing. As is evident, our situation, however, involves a husband/presumptive father seeking a blood test in a support case in which he is a defendant. Thus, while the above cited cases contain principles which are instructive, they do not, we believe, contain holdings which govern the outcome of this case. Instead, we are satisfied, here, to be guided by the case of *Faust v. Faggart,* 406 Pa. Super. 357, 594 A.2d 660 (1991). That case involved a support action. The mother and alleged father had been married and became separated in October of 1983. Notwithstanding the separation, the parties met and engaged in sexual intercourse in August of 1984. The child, Anthony, was born March 31, 1985. The mother testified that the child was two months premature. In December of 1985, the parties were divorced. A support action was initiated approximately four years later. The alleged father, and former husband of the petitioner, denied paternity. As in this case, he filed a petition requesting blood testing of himself, the mother and the child. The trial court denied his petition. The Superior Court reversed. On appeal, the father had not argued that he succeeded in rebutting the presumption of paternity through evidence of non-access or impotency. To the contrary, he argued that he was prevented from obtaining and submitting the best evidence available to him to rebut the presumption, namely, exclusionary blood test results. He contended that he had a right to submit such evidence based on the Uniform Act on Blood Test to Determine Paternity, 42 Pa.C.S. §§6131-37 (1982), now 23 Pa.C.S. §5104 (1990). Judge Beck, writing for the court, noted:

"Had this case arisen only a few years ago, the correct disposition of the issue presented would have been ob-

vious. Under both the clear language of the Act and cases construing it, appellant would have been found to have a right to obtain blood tests of himself, the mother and the child and to use the results of those tests to attempt to rebut the presumption and avoid a support obligation. *Id.* section 6137; *Nixon v. Nixon,* 354 Pa. Super. 232, 511 A.2d 847 (1986); *Parenti v. Parenti,* 263 Pa. Super. 282, 397 A.2d 1210 (1979); *Commonwealth ex rel. Goldman v. Goldman,* 199 Pa. Super. 274, 184 A.2d 351 (1962). It is only because of certain more recent developments in our case law that the issue posed has become more difficult to resolve. See *e.g., Scott v. Mershon,* 394 Pa. Super. 411, 576 A.2d 67 (1990). Despite these more recent cases, however, we conclude that appellant was improperly denied the opportunity to obtain blood tests under the Act and that the trial court must, therefore, be reversed." *Id.* at 360, 594 A.2d at 661.

The Superior Court went on to explain that the matter of whether or not there was a right to obtain blood testing in that particular case was a matter of statutory construction. The court then went on to cite a number of cases which construed the statute as giving blanket authority to an alleged father to compel blood testing even to rebut the presumption of legitimacy. The court, however, went on to acknowledge that even more recent cases have called this absolute right into question. One such case was *John M. v. Paula T.,* which we have discussed *supra.* The Superior Court distinguished *John M.* from the *Faust* case in large part by observing that John M., the petitioner, was not the mother's husband. In *Scott v. Mershon,* 394 Pa. Super. 411, 576 A.2d 67 (1990), the other of the more recent cases discussed in *Faust,* the Superior Court noted that the question presented in *Scott* was whether a mother had the right

to obtain blood tests of herself, her child and a man other than her husband to prove that the other man was the child's father. The *Faust* case stands for the proposition, among other things, that the right of the husband/alleged father to compel blood testing is "completely distinguishable" from situations involving requests by other parties. In an obvious reference to the doctrine of estoppel, the *Faust* court went on to note:

"Of greatest importance, however, is the fact that both *John M.* and *Scott* involved an attempt to disrupt an intact family by obtaining blood tests to prove that the presumed father of the child in question was not really the father, but rather that a third party outside the marriage was the true father. This case involves no such attempt. Here, there is no intact family to protect nor has there ever been one. Mother testified that the child in question does not even know appellant, the alleged father. Therefore, the concerns expressed by the Supreme Court in *John M.* and by a panel of this court in *Scott* regarding the interests of the Commonwealth in preventing the *disruption of a marriage and an intact family are inapposite to our analysis of the rights of the parties to this case. Clearly these concerns motivated the court in both of those cases to prevent the party seeking blood tests to use the Act in a manner that undermined these interests."* Id. at 367, 594 A.2d at 665. (emphasis supplied)

The case sub judice falls in an even grayer area than the facts of *Faust.* The plaintiff, in this case, argues that even if Mr. M. is entitled to use a blood test to rebut the presumption of legitimacy, he is nonetheless estopped because he, for a period of time, held himself out to be the father of Ethan. We do not agree. Here, the defendant, satisfied that he was not the father, nonetheless took the child in to avoid embarrassment to

everyone concerned, including the mother. He attempted to create an intact family for the benefit of all concerned. His efforts proved fruitless. The parties separated and from that day forward, and indeed well before the filing of the pleading which gave rise to the most recent hearing, the husband disavowed paternity and has had nothing to do with the child.

A blood test in this case would not have the effect of disrupting a marriage nor would it, in any way whatsoever, threaten the existence of an intact family. On the other hand, the failure to direct blood testing in this case would have two deleterious effects. First, it could assist in the perpetration of a sad fiction whereby the defendant would be called upon to financially support a child, who is arguably not his, for the rest of the child's minority and, perhaps, even into his college years. Second, it would have the effect of punishing the defendant for having attempted to reconcile with his wife by acting in loco parentis to her child.

### ORDER

And now, January 4, 1995, the request of the defendant to have the parties and the minor child Ethan submit to blood group testing pursuant to Uniform Act on Blood Test to Determine Paternity, 23 Pa.C.S. §5104, is granted.